496 F.2d 723
 UNITED STATES of America, Appellee,
v.
William T. SOMERS et al., Appellant in No. 73-1523.
Appeal of Karlos R. LaSANE in No. 73-1524.
Appeal of Arthur W. PONZIO in No. 73-1525.
Appeal of Germaine E. FISHER in No. 73-1526.
 Nos. 73-1523 to 73-1526.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 10, 1973.
Decided March 27, 1974.
 
 John G. Graham, McGlynn, Ruprecht & Graham, Newark, N.J., for appellant in No. 73-1523.
 William Goddard Lashman, Atlantic City, N.Y., for appellant in No. 73-1524.
 Burton A. Rose, A. Charles Peruto, Philadelphia, Pa., for appellant in No. 73-1525.
 John W. Noonan, Noonan & Flynn, Newark, N.J., for appellant in No. 73-1526.
 Jonathan L. Goldstein U.S. Atty., Newark, N.J., for appellee in all cases.
 Herbert J. Stern, Former U.S. Atty., John J. Barry, Richard S. Zackin, Richard D. Shapiro, Asst. U.S. Attys., Newark, New Jersey, attorneys for appellee.
 Before HASTIE, HUNTER and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 On May 14, 1972, a federal grand jury returned a twenty-six count indictment against William T. Somers, Richard S. Jackson, Arthur W. Ponzio, Karlos LaSane, Sane, Robert Glass, Germaine Fisher and Florence Clark. Count 1 of the indictment charged the seven defendants with conspiring to violate the Hobbs Act, 18 U.S.C. 1951[1] by obtaining through extortion the property of contractors, engineers, suppliers, property owners and licensees who dealt with the City of Atlantic City, New Jersey. Count 2 charged the seven defendants with conspiring to violate the Travel Act, 18 U.S.C. 1952,[2] by utlizing the facilities of interstate commerce to cause the commission of bribery and extortion in violation of New Jersey law. Counts 3, 5, 7, 9, 11, 13, 15, 17, 19, 20 21, 22, 23, 24, 25, and 26 charged that the seven defendants, in furtherance of the conspiracy alleged in Count 1, obtained sums of money by extortion from designated businesses engaged in interstate commerce. Counts 4, 6, 8, 10, 12, 14, 16, and 18 charged that the seven defendants, in furtherance of the Travel Act conspiracy, obtained by extortion sums of money delivered to Atlantic City firms from states other than New Jersey.
 
 
 2
 Trial commenced on January 15, 1973 before Judge Cohen. During the trial, defendants Jackson and Glass pleaded guilty to Count 1 and defendant Clark entered a plea of nolo contendere to Court 1. On motion of the Government, Counts 4, 5, 23 and 24 were dismissed at the close of the prosecution's case. Finally, on March 8, 1973, the jury returned its verdict, finding defendant Somers guilty on Count 26, defendant Ponzio guilty on Counts 1, 2, and 5-18, defendant LaSane guilty on Counts 1, 2, 21 and 22, and defendant Fisher guilty on Counts 1, 2, 5-8, 17 and 18. Sentences were imposed on May 21, 1973,[3] and defendants Somers, Ponzio, LaSane and Fisher appealed.
 
 
 3
 At trial, the Government sought to demonstrate a criminal conspiracy in which Atlantic City public officials exacted tribute from businessmen who were anxious to receive favorable treatment from purchasing and licensing departments of the local government. The conspirators held high offices in Atlantic City Government: two Mayors (defendants Jackson and Somers), two Commissioners of Parks and Public Property (defendant LaSane and unindicted co-conspirator Albert Shahadi), a Superintendent of Airports, Parks and Recreation Areas (defendant Glass), an Executive Secretary to the Director of Public Works (defendant Fisher) and an Assistant Purchasing Agent (defendant Clark) were allegedly involved in the conspiracy. It was the Government's theory that the alliance of these officers created an atmosphere in Atlantic City whereby local businessmen knew that kickbacks were required in order to secure favorable treatment from the city government.
 
 
 4
 To substantiate its theory, as well as to prove the substantive counts of the indictment, the Government adduced testimony from a number of witnesses who admitted paying kickbacks upon the demand of one or more of the defendants. In general,[4] the evidence tended to show that payoffs were accomplished in several different ways. A few witnesses testified that certain of the defendants demanded annual payments in return for a promise of continued business from the City. Other witnesses described a more elaborate scheme in which certain defendants would ascertain the price of equipment and then suggest that the price be inflated so as to include the amount of a kickback. Upon receipt of payment, the seller would pay back a portion of the total price (normally 10%), in cash, to the official involved. In order to preserve the outward manifestations of a rational and legitimate municipal bidding structure, the seller would be instructed to draw up the specifications (subsequently published by the City) in such a way that only its own equipment would qualify. This tactic normally served to screen out competitors who would not pay kickbacks to the defendants. The testimony indicated that in certain rare instances when 'non-complying' bids were initially submitted along with 'complying' bids, all bids were rejected. Thereafter, the 'complying' bids alone were resubmitted and were accepted. Still another witness testified that in one instance, a substantial payoff was demanded in return for favorable treatment on a license application.
 
 
 5
 Three of the appellants (Somers, Ponzio and Fisher) testified in their own defense. In addition to the three defendants' denials of any extortion conspiracy, numerous defense witnesses explained that they (the witnesses) had done business with Atlantic City without ever being required to make a kickback and denied that it was common knowledge that payoffs were required in order to secure favorable treatment from the City.[5]
 
 
 6
 As might be expected after a trial of almost three months duration, appellants allege a number of trial errors. We find it necessary to comment upon the contentions that the District Court erred: (a) in refusing to sever the case either prior to or during trial; (b) in refusing to permit the defense to recall a Government witness for further cross-examination; (c) in refusing to permit the defense to call Frank Nugent as a witness; (d) in refusing to require a new trial on the basis of prejudicial remarks made by the Assistant United States Attorney; and (e) in failing to strike the testimony of witness Herbert Wernikove or, alternatively, to grant a mistrial on the basis of a time variance between the indictment and the evidence adduced at trial. After a careful review of the record and briefs, we hold that reversible error was not committed and, accordingly, we affirm.[6]
 
 I. SEVERANCE
 
 7
 Appellants Somers and Fisher[7] contend that it was error for the District Court to reject their pretrial motions for severance of their individual cases and for severance of particular counts pursuant to Fed.R.Crim.P. 8(b).[8] In the alternative, even if joinder were initially proper, the appellants contend that the Court should have severed their individual cases when, during trial, alleged prejudice became apparent. See Fed.R.Crim.P. 14.[9]
 
 A. Rule 8 Motions
 
 8
 In deciding whether there has been a misjoinder under Rule 8(b), this Court must make an independent determination as to whether or not the Rule's mandate has been followed. Wright and Miller, 1 Federal Practice and Procedure, 144; see also Ingram v. United States, 272 F.2d 567, 569 (4th Cir. 1959).
 
 
 9
 Appellants Somers and Fisher base their Rule 8(b) argument upon the suggestion that the substantive counts in the indictment were not part of the same series of transactions. We find little merit in this argument. A Rule 8(b) motion is addressed to the pleadings, and not to the proof subsequently adduced. Provided that the indictment charges that the offenses joined constitute a single series of acts or transactions, severance will not be required. The allegation of a conspiracy in the instant case satisfies this mandate. As Professor Wright explains:
 
 
 10
 Joinder is permitted of a conspiracy count and substantive counts arising out of the conspiracy, since the claim of conspiracy provides a common link, and demonstrates the existence of a common scheme or plan.
 
 
 11
 Wright and Miller, 1 Federal Practice and Procedure, 144. See also Gordon v. United States, 438 F.2d 858, 878 (5th Cir.), cert. denied, Crandall v. United States, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); United States v. Bryant, 364 F.2d 598, 603 (4th Cir. 1966). Thus, provided that the conspiracy charge is put forward in good faith, the combination of a conspiracy count with counts charging acts in furtherance of the conspiracy will survive attack under Rule 8(b). See United States v. Donaway, 447 F.2d 940, 943 (9th Cir. 1971). Appellants neither demonstrate nor allude to bad faith in the inclusion of the conspiracy counts herein. Accordingly, we conclude that the District Judge did not err in denying appellants' 8(b) motions.
 
 B. Rule 14 Motions
 
 12
 The disposition of Rule 14 matters is normally within the discretion of the District Court. See United States v. Barber, 442 F.2d 517, 529 (3d Cir. 1971), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971); United States v. Lipowitz, 407 F.2d 597, 599 (3d Cir. 1969), cert. denied, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969). In the absence of an affirmative showing of an abuse of discretion, this Court will not interfere with the Rule 14 determinations made by the District Court. United States v. Barrow, 363 F.2d 62, 67 (3d Cir. 1966), cert denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); United States v. Kenny, 462 F.2d 1205, 1217 (3d Cir.), cert. denied, Murphy v. United States, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). The burden of demonstrating such abuse is a heavy one. United States v. Ford, 451 F.2d 1163, 1166 (5th Cir. 1971). Indeed, the Supreme Court has indicated that it will not intervene in such matters unless the District Court's ruling is clearly erroneous. See Schaffer v. United States, 362 U.S. 511, 513, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); cf. United States v. Barber, supra, 442 F.2d at 529 ('clear' prejudice must be shown).
 
 
 13
 Under Rule 14, the District Court had 'a continuing duty at all stages of the trial to grant a severance if prejudice (did) appear.' Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). Appellants Somers and Fisher contend that in numerous ways the failure to sever the defendants' cases produced prejudice and hence constituted an abuse of discretion.
 
 
 14
 Both appellants claim that little of the evidence presented at trial related to their participation in the alleged offenses. They suggest that they were prejudiced by the fact that the Government's evidence against other defendants was much more substantial than the evidence introduced against them. We find this contention to be without legal significance. In this Circuit, a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party. See United States v. De Larosa, 450 F.2d 1057, 1065 (3d Cir. 1971), cert. denied, Bashen v. United States, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). In the contest of a Rule 14 application, we have declared that a '. . . primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility.' Id. Although the instant case may well have been more complex than De Larosa, we nevertheless are convinced from our review of the record that the jury could have reasonably been expected[10] to compartmentalize the evidence as it related to the defendants herein. We therefore find no abuse of discretion.
 
 
 15
 Appellant Fisher also claims that his joinder with other defendants prejudiced his case: (1) by preventing him from compelling testimony of the co-defendant LaSane; and (2) by precluding him from commenting on LaSane's failure to take the witness stand. This Court rejected a contention similar to the first of these claims in United States v. Barber, 442 F.2d 517, 529 (3d Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971), our rejection being based on the conclusion that a defendant would be unable to compel testimony from a codefendant even if their cases were severed. '. . . The constitutional right of a defendant not to testify at the behest of a codefendant remains his right despite the severance of their trials.' Id. at n.22. Cf. United States v. Carella, 411 F.2d 729, 731 (2d Cir. 1969), cert. denied, Erhart v. United States, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969). Fisher has made no showing that LaSane would have testified voluntarily in Fisher's case had the defendants been severed. Absent such a demonstration, appellant has neither proven the prejudice which is the basis for a Rule 14 motion nor the abuse of discretion which would require action by this Court. See United States v. Kahn, 381 F.2d 824, 841 (7th Cir. 1967), cert. denied 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967) (the unsupported possibility that a co-defendant would testify in a severed case does not render the refusal to sever erroneous).
 
 
 16
 Nor do we feel that Fisher has made a sufficient demonstration with respect to his (Fisher's) inability to comment upon his co-defendant's silence. We have heretofore concluded that 'there must be a showing that real prejudice will result from the defendant's inability to comment' before joinder will be deemed erroneous. United States v. Addonizio, 451 F.2d 49, 62-63 (3d Cir.), cert. den., 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); See also United States v. Kahn, supra, 381 F.2d at 840; cf. Hayes v. United States, 329 F.2d 209, 221 (8th Cir.), cert. denied, Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964). In administering this standard, we, like the Seventh Circuit,[11] focus inter alia upon whether or not the defenses asserted (by fisher and LaSane) are mutually exclusive. Id. 451 F.2d at 63. Where there is mutual exclusivity among the defenses (i.e., where acceptance of one defense requires rejection of the others), the ability to comment on the failure to testify is significant, for such comment may well influence which of the defenses will be believed by the jury. Appellant Fisher has neither alleged such exclusivity nor demonstrated any other real prejudice flowing from his inability to comment upon LaSane's failure to testify. Accordingly, we find no abuse of discretion in refusing to sever Fisher's case.
 
 
 17
 Finally, appellant Somers contends that 'specific acts of prejudice' resulted from the refusal of the District Court to sever his case. The most significant of these acts occurred during the cross-examination of Herbert Wernikove. On direct examination, Wernikove testified that he had witnessed a series of negotiations resulting in the payment of $5000 to Somers to influence the granting of a municipal license. On cross-examination, Somers' counsel utilized an FBI report in an attempt to demonstrate that Wernikove had made prior inconsistent statements. During this colloquy, defendant Ponzio's counsel sought a preliminary ruling precluding the revelation of his client's name in the course of examining Wernikove with regard to the FBI report.[12] The Court granted Ponzio's application, thereby precluding Somers' counsel from demonstrating that the statement referred to Somers' co-defendant. On appeal, Somers suggests that this ruling prevented him from establishing the defense that it was Ponzio who was 'the true culprit.' Appellant's Brief at 98. The prejudicial impact of this ruling was slight. Inasmuch as both Somers and Ponzio took the stand and testified, and inasmuch as Ponzio was subjected to cross-examination by Somers, we fail to appreciate any lack of opportunity on the part of Somers to establish his codefendant's involvement.[13] Given these circumstances, we hold that Somers was not prejudiced either by the Court's protective order or by the refusal to sever. We also conclude that the other 'specific acts of prejudice' alleged by Somers fail to demonstrate reversible error.
 
 II. REFUSAL TO RECALL A WITNESS
 
 18
 In the midst of the presentation of Somers' defense, Somers' counsel moved to recall Government witness Herbert Wernikove for further cross-examination. Appellant Somers contends that the District Court's denial of this application constitutes reversible error.
 
 
 19
 On direct examination, Wernikove testified that he was sent to Atlantic City by Maurice Salvia and Daniel Marino to obtain a license for a boardwalk 'jam joint.'[14] Wernikove claimed that defendant Somers told him (as well as Marino) that the license would cost $10,000, thereby discouraging any plans for an immediate opening of a jam joint. A few months later, unindicted Co-conspirator Angelo Cibbotti informed Wernikove that the license was obtainable. Wernikove testified that in the early months of 1969, he, Marino, and Salvia met Cibbotti in the lobby of a Holiday Inn in Atlantic City. In response to Cibbotti's inquiry as to whether 'the money was brought down,' Salvia displayed an envelope filled with $100 bills. Wernikove stated that he saw the $100 bills in the envelope and estimated the total value at $5000. After Cibbotti returned from a telephone call, defendant Somers arrived at the Holiday Inn and joined the others in the coffee shop. According to Wernikove, the envelope was then passed to Cibbotti, who in turn handed it to Somers. One year later, Marino and Salvia obtained a boardwalk license for a jam joint.
 
 
 20
 Appellant Somers' counsel had a full and complete opportunity to cross-examine Mr. Wernikove. The cross-examination touched upon practically all of the points raised in the direct testimony. In addition, Somers' counsel attempted to impeach Wernikove by means of a report filed by an FBI agent after a pretrial interview with Wernikove.[15]
 
 
 21
 Despite this opportunity to question Wernikove, Somers claims that he was prejudiced by the Court's refusal to recall the witness. The appellant urges that recall was necessary on three separate grounds. First, during the initial cross-examination, Somers' counsel had inadvertently failed to confront Wernikove with the contents of the final paragraph of the FBI report (see n.15, supra). This paragraph, indicating that the witness had heard that a payoff was made to Somers, might be deemed to contradict rather than supplement Wernikove's testimony on direct examination that he had seen the money pass hands.[16] Appellant Somers alleges that had the Court allowed recall, his counsel would have been able to correct this inadvertency and impeach the witness on a point characterized by Somers as crucial to the Government's case. Secondly, Somers' counsel requested recall in order to examine Wernikove upon his criminal record. According to appellant, his counsel learned after Wernikove had left the witness stand that: (1) the witness was arrested in 1969 for passing bad checks, (2) the 'bankruptcy' offenses which the witness mentioned in his testimony on direct examination may have involved perjury, and (3) the witness was on federal probation during the trial in the instant case. Somers suggests that had recall been permitted, his counsel would have been able to impeach Wernikove's credibility by showing prior bad acts and an incentive to color testimony in favor of the Government.[17] Thirdly, recall was requested to impeach Wernikove with regard to the witness' relationship to Daniel Marino and Maurice Salvia. On direct examination, Wernikove portrayed that relationship as being amicable: the witness testified that he was Marino's and Salvia's employee and agent.[18] According to appellant Somers, his counsel learned after Wernikove had testified that both Marino and Salvia had been indicted for making extortionate loans to Wernikove between February 1969 and October 1971. Somers suggests that as a victim in a separate case, Wernikove would be biased in favor of the Government in the instant case. Had recall been granted, appellant contends that his counsel could have utilized the Marino-Salvia indictment to establish bias and to contradict the portrayal of the Marino-Salvia-Wernikove relationship suggested by the witness.
 
 
 22
 A determination as to whether or not a witness should be recalled for further cross-examination is a matter for the discretion of the District Court, reviewable only upon a demonstration of an abuse of that discretion. Faust v. United States, 163 U.S. 452, 455, 16 S.Ct. 1112, 41 L.Ed. 224 (1896); United States v. Kenny, supra, 462 F.2d at 1226; United States v. Soares, 456 F.2d 431, 434 (10th Cir. 1972); Belanger v. Alton Box Board Co., 180 F.2d 87, 94 (7th Cir. 1950). In Kenny, this Court upheld a refusal to recall a witness when it was shown that (a) the purpose of the recall was not to introduce substantive evidence, but rather was to further impeach the credibility of an already impeached witness, and (b) the documents upon which the requested examination would have been based were available at the time of the original cross-examination.[19] We find that both of these factors exist in the instant case as well.
 
 
 23
 Analysis of the purposes alleged by Somers for the recall indicates that the primary goal of the recall was to impair the credibility of Wernikove, a self-admitted 'conartist.'[20] Appellants concede that they would have utilized the full FBI summary for the purpose of impeaching Wernikove's credibility. Appellant Somers' Brief at 67. Similarly, the exploration of prior convictions was apparently aimed at diminishing credibility by identifying the witness as a felon and by suggesting a bias if in fact the witness was still on probation. Finally, in cross-examining Wernikove on his relationship with Salvia and Marino, Somers hoped to contradict an earlier suggestion of an amicable relationship and to establish a bias in favor of the Government.
 
 
 24
 Furthermore, it is apparent that Somers' counsel had adequate information to make many of the above inquiries during the original cross-examination. The 'prior inconsistent statement' (arguably indicating that Wernikove may not have seen the transfer of the $5000 payoff) was part of an FBI summary transmitted to defendant at the close of the Government's case pursuant to the Jencks Act, 18 U.S.C. 3500. Similarly, defense counsel had ample opportunity to explore Wernikove's bankruptcy fraud conviction on cross-examination.[21]
 
 
 25
 There is some dispute with regard to the prior availability of documents necessary for cross-examination on the relationship of Wernikove to Salvia and Marino. Somers claims that it was only after the close of the Wernikove cross-examination that his counsel first learned of an indictment charging Salvia and Marino with conspiring to make extortionate extensions of credit. The District Court disagreed. In announcing its refusal to recall Wernikove, the Court indicated its belief that Somers' counsel was aware of the indictment at the time of the original cross-examination. On the basis of the record before us, we cannot quarrel with this finding of prior availability.[22]
 
 
 26
 Given the admitted purposes for recalling Wernikove and the full opportunity of Somers' counsel to inquire into these matters during his original cross-examination, we find that the District Court did not abuse its discretion in refusing the recall.
 
 
 27
 III. REFUSAL TO COMPEL A PROSPECTIVE WITNESS TO TAKE THE WITNESS STAND
 
 
 28
 As part of his client's defense, Commissioner Ponzio's counsel had hoped to call one Frank Nugent-- allegedly 'the biggest single contractor doing business with (Atlantic City)'-- as a witness. Counsel planned to elicit from Nugent testimony which would contradict the Government's theory that it was common knowledge in Atlantic City that kickbacks were necessary if one wished to do business with the municipal government.
 
 
 29
 Prior to calling Nugent to the witness stand, Ponzio's counsel discussed possible lines of inquiry with the prospective witness. On the basis of this conversation, the witness' counsel (Charles Nugent, Frank Nugent's brother) advised the Court that his client would plead the Fifth Amendment if called to testify. The Court accepted this representation and accordingly did not require Frank Nugent to take the witness stand.
 
 
 30
 Appellant Ponzio contends that it was error for the Court to excuse the potential witness without first permitting counsel to propound questions to him on the witness stand. Both Ponzio and the Government have addressed themselves to this issue strictly in terms of the exercise of the Fifth Amendment privilege against self-incrimination. We adopt a different approach.
 
 
 31
 District judges have wide discretion in limiting the number of defense witnesses called to the stand. In United States v. Baysek, 212 F.2d 446 (3d Cir. 1954), this Court declared that:
 
 
 32
 The limitation of witnesses whose testimony will be cumulative of that already received is a matter within the sound discretion of the trial judge.
 
 
 33
 212 F.2d at 447. Accord: Fast v. Wainwright, 439 F.2d 1162, 1165 (5th Cir. 1971); Loux v. United States, 389 F.2d 911, 917 (9th Cir. 1968), cert. denied, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968); Petersen v. United States, 268 F.2d 87, 88 (10th Cir. 1959). Admittedly, the situation in Baysek was somewhat different than the situation in the instant case. In Baysek, the defendant had already called seven character witnesses by the time that the district judge exercised his discretion to limit such testimony. Here, defendant Ponzio had not yet called the host of witnesses lined up to contradict the Government's theory of 'common knowledge' when the Nugent matter surfaced. However, the District Court was well aware of the nature of the testimony which Ponzio expected to elicit. In response to the protestation that the inability to call Frank Nugent deprived Commissioner Ponzio of a fair trial, the Court fittingly remarked:
 
 
 34
 'I can preceive no possible prejudice by the failure to produce Mr. Nugent. Admittedly, you got a roomfull of suppliers and dealers with Atlantic City who are going to disprove the theory of the Government's case that everybody in Atlantic City has to pay off in order to do business. We are only dealing with one witness now, one supplier out of what you termed on several occasions 'a roomfull of them."[23]
 
 
 35
 The Court's predictions were subsequently borne out. Twelve witnesses called by Ponzio testified that the Commissioner had not demanded kickbacks in return for business. These witnesses also denied that kickback requirements were a matter of common knowledge in Altantic City.
 
 
 36
 Viewing the record in retrospect, it is clear that the testimony expected from Frank Nugent would have added little to that aduced from the dozen other witnesses called by Ponzio. We are thus convinced that Ponzio was not prejudiced by the refusal to compel Mr. Nugent to take the witness stand. Inasmuch as the Court had a firm basis for assuming that the testimony would be cumulative, and given the actual cumulative nature of the evidence, we find no abuse of discretion in the District Court's not requiring Frank Nugent to testify.
 
 IV. PROSECUTORIAL MISCONDUCT
 
 37
 Each of the appellants complain that they were denied a fair trial as a result of prejudicial comments made by the prosecutor during the course of the trial. We have faced this question all to frequently in recent years.[24] In this case, the allegations of misconduct are based in large part upon conduct which we find difficult to countenance. We are called upon to determine whether these improprieties are of such a dimension as to require a new trial.
 
 We of course reiterate that:
 
 38
 A United States Attorney in a criminal case has an even greater responsibility than counsel for an individual client. For the purpose of the individual case he represents the great authority of the United States and he must exercise that responsibility with the circumspection and dignity the occasion calls for.
 
 
 39
 United States v. Kravitz, 281 F.2d 581, 587 (3d Cir. 1960), cert, denied, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961). Were we sitting as purely a disciplinary body, we might well consider reversing any conviction in which prosecutorial misconduct was evident. Considerations of judicial administration, however, preclude us from reversing every time that we find adversarial improprieties. As this Court had recognized, trials are 'rarely, if ever, perfect.' United States v. Leftwich, 461 F.2d 586, 590 (3d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178 (1972). Given our primary concern with the fairness of the procedure, we will reverse upon demonstrations of prosecutorial misconduct only in those situations in which prejudice inures to the defendant from the challenged improprieties. See Frazier v. Cupp, 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).
 
 
 40
 We shall consider the appellants' claims seriatim.
 
 1. OPENING ARGUMENT
 
 41
 In Government of Virgin Islands v. Turner, 409 F.2d 102 (3d Cir. 1969), this Court analyzed the legitimate functions of an opening statment. We stated that:
 
 
 42
 The purpose of an opening is to give the broad outlines of the case to enable the jury to comprehend it. It is not to poison the jury's mind against the defendant . . ..
 
 
 43
 409 F.2d at 103. Analysis of the record indicates to us that although the Assistant United States Attorney paid lip service to the legitimate purpose of an opening,[25] he nevertheless departed from that objective by studding his opening with overly-dramatic, unnecessary characterizations.[26]
 
 
 44
 We fail to see how the characterizations contained in the opening added to the outline of the Government's case. The appellee contends that the offending statements were substantiated by evidence adduced at trial and, accordingly, that their inclusion in the opening was justified. Whether or not proofs were ultimately adduced warranting such characterizations is irrelevant. Such characterizations add nothing to the legitimate education of the jury which is not afforded by the proper presentation of facts to be proved.[27] We categorically disapprove of remarks which serve only to color subjectively the minds of the jury at the outset of the trial.
 
 
 45
 We must determine whether the defendants were prejudiced by the characterizations. In United States v. Leftwich, supra, we declared that:
 
 
 46
 . . . Improprieties of argument by counsel to the jury do not call for a new trial unless they are so gross as probably to prejudice the defendant and the prejudice has not been neutralized by the trial judge before submission of the case to the jury.
 
 
 47
 461 F.2d at 590. In the instant case, the District Court did attempt to neutralize the effect of the offending statements. At the outset of the trial, the Court instructed the jury that statements of counsel did not constitute evidence. Similarly, after defendants objected to the prosecutor's opening remarks,[28] the Court stated:
 
 
 48
 'Here, once more, as I also instructed you yesterday, and as I will instruct you in my charge at the end of the entire case, whatever counsel for the Government has said and whatever counsel for the defendants may say is not evidence. The evidence that you will consider in reaching your verdict is what you hear from the witnesses who will be presented to you.'
 
 
 49
 Again, at the close of the case, the Court reminded the jury to treat the arguments of counsel as devoid of evidentiary content.
 
 
 50
 Our review of the record convinces us that whatever prejudicial effect there may have been was neutralized. In addition to the curative statements made by the District Judge, the jury was also instructed by the prosecutor that his comments were not to be considered as evidence (see n.25, supra). Furthermore, the length of the trial (almost three months) serves to minimize the effect of comments made at the very beginning of the proceedings. See Frazier v. Cupp, 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Cf. United States v. Kravitz, 281 F.2d 581 (3d Cir. 1960), cert. denied, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961); United States v. White, 486 F.2d 204 (2d Cir. 1973); see also Singer, Forensic Misconduct by Federal Prosecutors-- and How it Grew, 20 Ala.L.Rev. 227, 239-242 (1968). Though the remarks were improper, we do not believe that the characterizations in the Government's opening played any real part in convicting the defendants. Accordingly, we reject this ground for a new trial.
 
 
 51
 Alluding to the fact that the jury eventually acquitted him on the conspiracy counts, appellant Somers charged that references in the opening statement to his complicity in the conspiracies[29] deprived him of a fair trial. We disagree. We know of no rule of law that requires a mistrial merely because the jury does not believe that a prosecutor's outline (presented in an opening statement) is true beyond a reasonable doubt.[30] Provided that the outline is an objective summary of evidence which the Government reasonably expects to produce, a subsequent failure in proof will not lead to an automatic finding of misconduct. Cf. Frazier v. Cupp. 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). Inasmuch as there is no indication in the record herein that the prosecutor outlined facts concerning Somers that he did not believe he could substantiate, we find no impropriety in the remarks suggesting that Somers played a role in the conspiracies.
 
 
 52
 Appellant Fisher's challenge to a 'variance' between the opening outline and the subsequent proofs is similarly rejected.
 
 2. STATEMENTS MADE DURING TRIAL
 
 53
 Appellants complain of various comments made by the prosecutor during the taking of evidence. Of these complaints, only one is of real significance. At the close of its case, the Government moved to dismiss four Counts of the indictment. In so moving, the prosecutor stated (before the jury):
 
 
 54
 'Your Honor, after the close of Court on Tuesday when the United States rested its case I made a motion of the government's behalf. The United States moved to dismiss counts 3 and 4 and counts . . . 23 and 24, on the basis that they did not wish to prolong the trial any further.'
 
 
 55
 Appellants contend that this statement prejudiced their cases by implying that the Government could have gained convictions on the four counts if it so desired.
 
 
 56
 We agree that the above statement improperly suggests that the evidence other than that presented could be submitted to support a conviction on counts 3, 4, 23 and 24. The technical nature of the remark, however, as well as its subtle overtones, minimizes its prejudicial impact. Given the immediate curative steps taken by the District Court,[31] we conclude that this minimal impact was successfully neutralized. Accordingly, we reject the contention that the above statement justifies a remand for a new trial.
 
 
 57
 3. REMARKS MADE DURING THE DEFENSE'S CLOSING ARGUMENT
 
 
 58
 The most serious of appellants' complaints relates to a remark made by the Assistant United States Attorney during the closing argument of Ponzio's counsel.[32] The record discloses the following colloquy:
 
 
 59
 Counsel for Ponzio: 'That case probably would have taken a week, possibly two, to try and it would have been strictly a one on one situation. Ask yourselves why did the Government, I won't say spin or concoct, why did they choose this theory of a conspiracy that goes back to a dead man, it goes back to 1960, and introduce evidence that takes us back to 1950 and require Arthur Ponzio to defend against that? 'And (the prosecutor) knows, or at least by this time should know, that a large part of that testimony is not true. He knows and the evidence shows it, Mr. Ponzio had no connection whatsoever with Albert Shahadi. He knows that he had nothing to do with Bob Glass. He knows that he had nothing to do with Florence Clark, other than the fact that that nice lady was the purchasing agent. He knows that Ponzio is independent of Somers and vice versa. He knows that Ponzio and LaSane are independent of each other and he knows now that poor Gerry Fisher shouldn't have ever been here. 'And whatever the political overtones were in Atlantic County that tried to creep in here from time to time, he knows that the number one man in the Democratic party at that time, Arthur Ponzio, had no connection with the number two man in the Republican party, Jimmy Boyd. His name was mentioned.' Assistant U.S. Attorney: 'Your Honor, I don't like to interrupt, but if you're goint to put my knowledge of what I know about this case not in evidence, I will speak on my summation what I know more about that is not evidence that will really fill out this whole void.'
 
 
 60
 The prosecutor's remark can easily be construed as a suggestion that the Government is aware of evidence, beyond that introduced at trial, implicating Ponzio. Such a suggestion is clearly improper. United States v. Scalia, 464 F.2d 1301, 1303 (3d Cir. 1972) (per curiam), cert. denied, 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596 (1973); Kitchell v. United States, 354 F.2d 715, 719 (1st Cir. 1966), cert. denied, 384 U.S. 1011, 86 S.Ct. 1970, 16 L.Ed.2d 1032 (1966); McMillian v. United States, 363 F.2d 165, 169 (5th Cir. 1966); United States v. Lefkowitz, 284 F.2d 310, 314 (2d Cir. 1960).
 
 
 61
 Ponzio suggests that United States v. Schartner, 426 F.2d 470 (3d Cir. 1970), requires a reversal on the basis of the above remark. In Schartner, this Court found the following remark to be per se reversible error:
 
 
 62
 I have a duty to protect the innocent and to see that the guilty do not escape. I say to you with all the sincerity I can muster that if you do not convict the defendant the guilty will escape.
 
 
 63
 We have since limited Schartner to its facts; Schartner requires a per se reversal only when the prosecutor expresses an opinion on the guilt of a defendant based on evidence not in the record. United States v. Benson, 487 F.2d 978, 981 (3d Cir. 1973); United States v. LeFevre, 483 F.2d 477, 479 n.1 (3d Cir. 1973). Although the remark at issue does represent a comment on evidence outside of the record, it does not constitute an opinion on the guilt of Commissioner Ponzio.
 
 
 64
 We do not hasten to extent Schartner to cover the instant case. While per se rules perform a valuable function in many areas of the law, such a short-hand approach is largely inappropriate to the evaluation of prosecutorial misconduct. Except where a type of comment is inherently prejudicial (as in Schartner), prosecutorial misconduct should be evaluated on a case-by-case approach. See United States v. White, 486 F.2d 204, 207 (2d Cir. 1973). The remark at issue, while clearly improper, is not so inherently prejudicial as to justify a per se rule. Accordingly, we must determine whether Ponzio was actually prejudiced by the statement.
 
 
 65
 It is well settled that a prosecutorial misstatement made in response to, and in rebuttal of, an improper inference suggested by defense counsel will not result in reversible error. See, e.g. United States v. Panepinto, 430 F.2d 613, 616 (3d Cir.), cert. denied sub nom., Orangio v. United States, 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970); United States v. Schartner, 426 F.2d 470, 477 (3d Cir. 1970); see also United States v. Casteel, 476 F.2d 152, 155 (10th Cir. 1973); United States v. Guajardo-Melendez, 401 F.2d 35, 39-40 (7th Cir. 1968). Asserting this 'reply' doctrine, the Government argues that the improper suggestions made by Ponzio's counsel (i.e. suggesting that the Assistant U.S. Attorney knew that Ponzio was not involved in the conspiracy) provoked the prosecutor's reply. We agree with the Government that defense counsel's statements were improper. Moreover, we recognize that the prosecutor's remark was causally related to defense counsel's statement. However, we do not believe that the reply doctrine protects the remark made by the Assistant U.S. Attorney. The doctrine serves to permit neutralization of improper defense arguments; it does not operate as a license for improper affirmative attacks upon defendants. Having heard defense counsel's statements, it would have been proper for the Assistant U.S. Attorney to have objected and to have requested an appropriate instruction. It was not proper, however, for the Assistant U.S. Attorney to launch an affirmative charge against Ponzio, especially when the charge inferred matters outside of the record.
 
 
 66
 Factors do exist, however, to mitigate the prejudice emanating from the record. The District Court instructed the jury (almost immediately after the remark was made) in the following terms:
 
 
 67
 'Members of the jury, once again an objection has been made by counsel and I instruct you that you are to completely disregard what (the prosecutor) stated, eliminate it from your minds. You are not to take it into consideration at all during the course of your deliberations on this case.'
 
 
 68
 The immediacy and stern nature of this curative instruction serves to neutralize the prejudice somewhat.
 
 
 69
 Furthermore, we regard the prosecutor's statement as being rather ambiguous. The prosecutor did not identify the 'void' which he was willing to fill. Did it relate to the previous comment about 'Jimmy Boyd' and the Republican Party? Or did it refer more generally to Ponzio's relationship with the other defendants? While the ambiguity of the prosecutor's remark does not transform an improper remark into a proper one, it does diminish the prejudicial impact upon the jury.
 
 
 70
 Finally, we note that the evidence against Ponzio was quite strong. Inasmuch as Commissioner Ponzio's guilt was clearly established by competent evidence, we are confident that the ambiguous remark, cured as it was by the Court's instructions, did not prejudice the defendant. Cf. United States v. LeFevre, 483 F.2d 477 (3d Cir. 1973); Government of Virgin Islands v. Turner, 409 F.2d 102, 104 (3d Cir. 1969).
 
 4. CLOSING ARGUMENT
 
 71
 Finally, appellant Somers objects to a portion of the Government's closing in which the prosecutor attempted to induce the jury to infer special treatment for Salvia's and Marino's 'jam joint' (East Coast Sales Demonstration, Inc.) from the fact that its license was never suspended. Specifically, the Assistant U.S. Attorney declared:
 
 
 72
 'Yet, you will recall that Mayor Somers told us he suspended the license of another firm. Why wasn't the East Coast license ever suspended? Why wasn't there a Court case? Why wasn't injunctive proceedings taken if they wanted to stop and close up these firms?'We do not decide whether this comment was improper. Fatal to Somers' contention is the fact that his counsel did not object to the above remarks at trial. In United States v. Lawson, 337 F.2d 800, 807 (3d Cir. 1964), cert. denied, 380 U.S. 919, 85 S.Ct. 913, 13 L.Ed.2d 804 (1965), this Court held that a failure to object to improprieties in a closing argument precluded appellate review in all cases except where 'plain error' is established. The impressive burden placed upon appellant is justified by the recognition that had a timely objection been made, remedial action, if appropriate, could have been taken, thereby avoiding a new trial. The error, if any, in this case was not 'plain error,' and hence, cannot serve as grounds for reversal.
 
 
 73
 While we do not condone the prosecutorial improprieties evident in this case, we conclude that the instances of such conduct, considered both individually and in their combined effect, did not prejudice the defendants. Reversal, therefore, is not warranted.
 
 
 74
 As we indicated earlier, our Court has too frequently been required to review the issue of prosecutorial misconduct. We feel quite strongly that we should not have to deal so constantly with such a recurring issue when it can so readily be avoided. We cannot leave this discussion, therefore, without some further observations pertaining to this general subject.
 
 
 75
 We do not suggest that a prosecutor abandon eloquence or advocacy.
 
 
 76
 'A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows.'
 
 
 77
 Viereck v. United States, 318 U.S. 236, 253, 63 S.Ct. 561, 569, 87 L.Ed. 734 (1943) (Black, J., dissenting). Nor do we suggest that a prosecutor is precluded from 'hitting hard.' Berger v. United States, infra, 295 U.S. at 88, 55 S.Ct. 629. Nevertheless, preparation, discipline, knowledge, restraint and responsibility should dictate the manner by and the area in which the blows should be struck.
 
 
 78
 Our society and our Courts cannot afford the luxury in terms of time and money of permitting federal prosecutors, even during lengthy trials, to abandon prosecutorial disciplines. 'A few injudicious words uttered in the heat of battle by an Assistant United States Attorney may undo months of preparation by police, prosecutorial, and judicial officers.' United States v. White, supra, 486 F.2d at 204.
 
 
 79
 The remedy rests with and in the office of each federal prosecutor. We suggest that this remedy be applied liberally and often. Absent such discipline, we can foresee that our approach to this problem may require more drastic and prophylactic rules.
 
 V. TIME VARIANCE
 
 80
 Count 26 of the indictment charges that the seven defendants extorted money from East Coast Sales Demonstration, Inc.[33] (Salvia's and Marino's 'jam joint'). Paragraph 5 of this Count, reprinted in the margin below,[34] alleges taht the extortion occurred 'between on or about January 1, 1970 and July 31, 1970.' In a letter dated December 27, 1972, the prosecutor basically reaffirmed these dates, informing defense counsel that the Government would prove at trial that the Count 26 acts occurred 'between on or about January 1, 1970 and on or about July 3, 1970.'[35] Nevertheless, at trial the Government's proof varied from the above dates. Witness Herbert Wernikove testified that in late 1968 Somers told him that it would cost $10,000 to obtain a boardwalk license for Marino's jam joint. Early in 1969, Angello Cibbotti (as previously noted, an unindicted co-conspirator) informed Wernikove that there would be no problem in obtaining a license. Wernikove explained that the subsequent meeting at the Holiday Inn, at which the payoff was made, was held early in 1969. Due to problems encountered in renting building space, East Coast was not opened until April of 1970.
 
 
 81
 At the close of the direct examination of Wernikove, Somers' counsel moved to strike his testimony on the grounds that the proof adduced was inconsistent with the dates stated in the indictment and in the December 27, 1972 letter. Pressed to explain this variance, the prosecutor stated that he had not learned until immediately before trial[36] that the payment occurred in the early part of 1969. The prosecutor explained that he had assumed that the payoffs had occurred just prior to the opening of the jam joint in 1970. The District Court denied Somers' motion to strike[37] on the ground that no prejudice was shown. On appeal, Somers-- the only defendant convicted on Count 26-- asserts that the time variance constitutes reversible error.
 
 
 82
 To evaluate the legal significance of Somers' contention, it is first necessary to trace the decisional law relevant to disparities between proof and indictment.
 
 
 83
 In Ex Parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1886), the Supreme Court held that the striking of terms in an indictment by a trial court denied defendants (felons) their constitutionally protected right to be tried only upon charges returned by a grand jury. Since a grand jury might base its indictment upon terms stricken by a trial judge, the Supreme Court established a per se rule against judicial amendments to the terms of an indictment.
 
 
 84
 A less rigid stand has been taken with respect to variances between the terms in an indictment and the evidence established at trial.[38] Rather than adopt a per se rule, the Supreme Court has developed a case-by-case approach for analysis of variances. In both Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court announced that variances would constitute reversible error only in those cases in which variances actually prejudice the defendant. Berger and Kotteakos suggest that the focus for variances is on the fairness of the trial, as opposed to the emphasis on pleading requirements suggested by Ex Parte Bain.
 
 
 85
 This dichotomy between the treatment of variances and amendments was clouded somewhat by Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In Stirone, the indictment charged a Hobbs Act offense relating to interference with the interstate transportation of sand. Both the proof at trial and the jury instructions permitted conviction on an alternate theory (namely, interference with shipments of concrete to a mill that would eventually produce steel which would move in interstate commerce). In finding this variance to be reversible error, the Court's analysis more closely paralleled the per se test of Bain than the Berger-Kotteakos focus upon trial prejudice.[39] The Court emphasized that the variance related to one of the essential elements in a Hobbs Act offense, the relationship to interstate commerce. Rather than speculate on the intent of the grand jury with regard to such an important factor, the Court vacated the conviction.
 
 
 86
 We do not read Stirone as mandating the Bain per se test for all variances. Rather, Stirone merely identifies one type of variance as constituting a 'constructive amendment' and then applies the stricter per se approach, applicable to amendments since Ex Parte Bain. The variance in Stirone was substantial: while the indictment specified one offense (interference with the interstate transportation of sand), the evidence demonstrated a completely different offense (interference with the interstate transportation of steel). The modification in the elements of the crime presented a substantial likelihood that Stirone may have been convicted of an offense other than that charged by the grand jury. The per se approach utilized in both Bain and Stirone is designed to protect against this possibility.
 
 
 87
 Thus, in evaluating variances, we must first determine whether there has been a modification in the elements of the crime charged. See United States v. De Cavalcante, 440 F.2d 1264, 1272 (3d Cir. 1971); United States v. Smith, 474 F.2d 844, 846 (3d Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 2162, 36 L.Ed.2d 692 (1973); cf. United States v. Bryan, 483 F.2d 88, 96 (3d Cir. 1973). If such a modification exists, we will apply the per se rule of Stirone so as to preserve the shielding function of the grand jury. If, on the other hand, the variance does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant, as in Berger and Kotteakos. See United States v. Bryan, supra, 483 F.2d at 69; cf. United States v. Dreer, 457 F.2d 31, 33-34 (3d Cir. 1972); United States v. Petti, 459 F.2d 294, 296-297 (3d Cir. 1972).
 
 
 88
 Appellant Somers contends that we are bound by United States v. Critchley, 353 F.2d 358 (3d Cir. 1965) to apply the per se approach in the instant case. In Critchley, a Hobbs Act indictment charged defendants with committing extortive acts 'on October 7 and 8, 1962.' The proof at trial disclosed no such activity on the dates specified, but did disclose that extortive threats were made on August 10 and October 5, 1962. On the basis of Stirone, this Court held that the threats proven could not be used to support the jury verdict of guilty. We declared:
 
 
 89
 The Supreme Court has indicated that indictments charging violation of the Hobbs Act must be narrowly construed . . .. This Court cannot allow the Government to prove interference with interstate commerce by threats made on October 5, 1962, and approximately one week earlier, when the indictment charged interference with interstate commerce by actions of the defendant on October 7 and 8, 1962.
 
 
 90
 353 F.2d at 362.
 
 
 91
 Critchley, however, may be distinguished from the instant case. Unlike the general language in the indictment before us (charging that the extortion occurred between on or about January 1 and July 31, 1970), the Critchley indictment restricted the relevant time frame to two specific dates. To the extent that Critchley adopted a per se rule, we limit it to situations in which the grand jury identifies specific dates for an offense. In such situations, it is reasonable to assume that the grand jury was indicting the defendant for acts occurring on the specific dates charged. Where, however, the grand jury speaks in more general terms, this assumption fails. By the use of the qualifying phrase 'on or about', the grand jury indicates its unwillingness to pinpoint the date of the offense charged. We will not particularize by a per se rule what the grand jury leaves vagus. Accordingly, we reject the contention that our precedent binds us to a per se approach.
 
 
 92
 Congress has not identified time as an essential element of either a Hobbs Act or Travel Act offense.[40] In the absence of such an identification, proof of the acts charged on any date within the statute of limitations and before the return date of the indictment is sufficient to support a conviction. See Ledbetter v. United States, 170 U.S. 606, 612, 18 S.Ct. 774, 42 L.Ed. 1162 (1898); See also United States v. Kerr, 439 F.2d 689, 690 (9th Cir. 1971); Russell v. United States, 429 F.2d 237, 238 (5th Cir. 1970); United States v. Covington, 411 F.2d 1087, 1088-1089 (4th Cir. 1969); Jacobs v. United States, 395 F.2d 469, 474 (8th Cir. 1968). We conclude, therefore, that the time variance alleged by Somers does not constitute a modification of the elements of the crime charged. Unlike the situation in Stirone, the variance herein does not undermine our confidence in the belief that the defendant was convicted of the crime charged by the grand jury. A per se approach to the variance is therefore precluded.
 
 
 93
 We must, instead, determine whether the time variance prejudiced Somers.[41] In making such a determination, we normally focus upon two issues:
 
 
 94
 a. Is there a danger that as a result of the variance, Somers may be prosecuted a second time for the same offense?
 
 
 95
 b. Was Somers so surprised by the proof adduced that he was unable to prepare his defense adequately?
 
 
 96
 See Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). We find nothing in the record or in Somers' brief on appeal to suggest that the time variance will cause double jeopardy problems for the appellant. Accordingly, we restrict our inquiry to the second of the issues posed above.
 
 
 97
 Herbert Wernikove testified on February 7, 1973. Somers' defense was not presented until thirteen days thereafter. Our review of the record indicates to us that this thirteen day period enabled Somers to become familiar with Wernikove's testimony and prepare a reasonable response. We base this conclusion upon two factors, Somers' testimony and the conduct of his counsel.
 
 
 98
 When Somers took the witness stand, he categorically denied: (1) meeting Wernikove; (2) demanding $10,000; and (3) receiving money as a result of a meeting at the Holiday Inn. Had Somers been given greater advance notice of the proper time frame, there would have been no change in these repudiations. He would have made the same categorical denials that were both offered and apparently discredited herein.
 
 
 99
 Given the thirteen day period between Wernikove's testimony and the presentation of Somers' defense, we believe that defense counsel had ample time to react to Wernikove's testimony. Our conclusion might well be different had Somers been attempting to develop an alibi defense during this period. Although Somers' counsel intimated that he had been preparing an alibi defense for the dates stated in the indictment, there was no suggestion that such a defense was considered for the dates to which Wernikove testified, nor offer of proof in that regard. Our conclusion that counsel had sufficient time is fortified by the fact that Somers' counsel did not request a continuance after Wernikove completed his testimony. We are confident that had counsel felt more time was required to analyze or deal with Wernikove's 'time' testimony, an application would have been made to the Court. While we do not suggest that such an application would necessarily have been granted, we treat the absence of such an application as an indication that the time interval was adequate for preparation.[42]
 
 
 100
 We hold, therefore, that Somers was not prejudiced by the time variance. Thus, the time variance asserted does not constitute reversible error.
 
 
 101
 Inasmuch as we find that each of the contentions raised by appellants is without merit, the judgment of the District Court will be affirmed.
 
 
 
 [1]
 The Hobbs Act provides, in pertinent part, that:
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section--
 (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 (3) The term 'commerce' means . . . all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof . . ..
 18 U.S.C. 1951.
 
 
 [2]
 The Travel Act provides, in pertinent part, that:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to--
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall befined not more than $10,000 or imprisoned for not more than five years, or both.
 (b) As used in this section 'unlawful activity' means . . .
 (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
 18 U.S.C. 1952. A conspiracy to violate the Travel Act is itself a violation of 18 U.S.C. 371.
 
 
 [3]
 The Court sentenced defendant Somers to a term of 2 1/2 years imprisonment; defendant Jackson to a term of 3 years imprisonment; defendant Ponzio to a term of 6 years imprisonment; defendant LaSane to a term of 4 years imprisonment; defendant Glass to a term of 2 years imprisonment; defendant Fisher to a term of 2 years imprisonment; and defendant Clark to a 2 year unsupervised probationary term, with sentence suspended. The terms of Ponzio, LaSane and Fisher represent total terms imposed by concurrent sentences
 
 
 [4]
 Inasmuch as we find that the evidence is clearly sufficient to support the verdicts against each of the appellants, we need not trace the evidence in detail. The general analysis above is presented solely to provide a framework upon which to examine the claims raised by the appellants
 
 
 [5]
 Numerous character witnesses were also presented by the defense
 
 
 [6]
 In addition to the contentions discussed in the text, we also reject:
 (1) Appellant Somers' allegations that the District Court erred (a) in refusing to grant a motion of acquittal on the theory that the evidence was insufficient to support a conviction under the Hobbs Act, (b) in permitting the Government to amend the indictment by a pretrial letter to counsel and by evidence adduced at trial, (c) in refusing to admit into evidence a tape-recorded statement by unindicted co-conspirator Angelo Cibbotti, (d) in precluding proof of the non-existence of 'East Coast Demonstration Sales, Inc.,' an entity named in Count 26, and (e) in refusing to admit into evidence a report written by an FBI agent after an interview with Herbert Wernikove;
 (2) Appellant Ponzio's allegations that the District Court erred (a) in refusing to grant a motion of acquittal on the theory that the evidence was insufficient to support a conviction under the Hobbs Act, (b) in permitting the Government to amend the indictment by a pretrial letter to counsel and by evidence adduced at trial, (c) in admitting into evidence writings made on envelopes, (d) in failing to instruct the jury with regard to the possibility of finding multiple conspiracies, and (e) in failing to instruct the jury that the testimony of immunized witnesses should be closely examined;
 (3) Appellant LaSane's allegations that the District Court erred (a) in permitting the Government to amend the indictment by a pretrial letter to counsel and by evidence adduced at trial, (b) in failing to instruct the jury with regard to the possibility of finding multiple conspiracies, (c) in denying his motions for a bill of particulars and for further discovery, (d) in refusing to grant a motion of acquittal on Counts 21 and 22 on the theory that the evidence was insufficient to support a verdict, and (e) in conducting a fundamentally unfair trial; and
 (4) Appellant Fisher's allegation that the District Court erred in denying his motions for a bill of particulars and for further discovery.
 
 
 [7]
 In their briefs, appellants Fisher and LaSane adopt by incorporation all applicable arguments raised by their co-appellants. To simiplify matters, our textual analysis shall refer only to those appellants who have independently raised questions of fact or law. Our conclusions rejecting these contentions, however, apply to all appellants
 
 
 [8]
 Fed.R.Crim.P. 8(b) provides that:
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same . . . series of acts or transactions constituting an offense or offenses.
 Federal Rule 8(a), dealing with the joinder of offenses, applies only to prosecutions involving a single defendant. If more than one defendant is indicted, the tests for joinder of counts and defendants is merged in Rule 8(b). See Cupo v. United States, 123 U.S.App.D.C. 324, 359 F.2d 990, 992 (1966), cert. denied, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967); King v. United States, 355 F.2d 700, 704-705 (1st Cir. 1966); United States v. Eagleston, 417 F.2d 11, 14 (10th Cir. 1969).
 
 
 [9]
 Fed.R.Crim.P. 14 provides, in pertinent part, that:
 If it appears that a defendant . . . is prejudiced by a joinder of . . . defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 [10]
 While we do not rely upon the verdict as returned to support that 'expectation', we cannot help but note that although Somers was indicted in 26 Counts, he was acquitted by the jury in all but one
 
 
 [11]
 See United States v. Kahn, supra, 381 F.2d at 824
 
 
 [12]
 The report suggests that Ponzio served as an intermediary in bringing about the license payoff. See n. 15, infra
 
 
 [13]
 In addition we question whether the unexpurgated report, if sought to be introduced, would have been admitted for the truth of the matter asserted. See McCormick, Law of Evidence, 39 (1954 ed.)
 
 
 [14]
 A 'jam joint' is a store in which products are demonstrated and then auctioned. Although the record contains no precise definition of the term, the following colloquy between Wernikove and Somers' counsel is informative:
 Q: 'Can you tell us what the difference is (between an auction and a jam joint)?
 A: The difference between the auction and the jam auction? They are both called in the terms of the fellows that were working, they are both called auctions but, in essence, they are not auctions. One is an auction where you put up something and the person that bids the most, buys it.
 Q: That is known as an auction?
 A: Yes.
 Q: What is the other?
 A: The other is where, as I say, you use words and it is completely prepared presentation to induce people to come in, sit down and spend their money.
 Q: Now, when they come in, isn't this the type of business where you would have so many items of one kind and hold one up for sale and get a price?
 A: No.
 Q: Well, you don't bid on the object. That is what I am talking about.
 A: You are not bidding on the object. There is a stage of elevation where you start with nickels for $20 items and then eventually you start selling items for ten cents, $10 items for a quarter and eventually you are selling $3 items for $30 and $40, because the progression goes in reverse, as you build up.'
 Tr. 1717-1719.
 
 
 [15]
 The FBI summary of the Wernikove interview states:
 'October 1, 1971 'HERBERT WERNIKOVE was interviewed at his residence, 27 Crestview Drive, Willingsboro, New Jersey. He furnished the following information which he stated is not complete in detail: 'He has worked as an auctioneer over the past several years. In 1967, he began employment as an auctioneer for Surf Auctions, Wildwood, New Jersey, in the employ of Daniel Marino and Maurice Salvia who he also knows as Marty. 'During the latter part of 1968, or early part of 1969, while in the employ of Salvia and Marino, he went to Atlantic City, New Jersey, for the purpose of establishing residency at the instructions of Salvia and Marino. The purpose of his obtaining residence in this city was to obtain a license permit to operate an auction in that city with, Salvia and Marino. 'Wernikove advised that he subsequently attended meetings with Salvia, Marino, Angelo Cibbotti, also known as Sonny, an Atlantic City police officer, and a second Atlantic City police officer whom he can identify but whose name he does not presently recall, at which discussions were held regarding payoff of $15,000 to Atlantic City Mayor William T. Somers, to secure a license to operate an auction. 'Wernikove advised that during these discussions he learned that Atlantic City Commissioner of Public Works, Arthur Ponzio, was acting as go-between for Salvia and Marino in the transaction to pay Somers and that Cibbotti was contacting Ponzio. 'Wernikove stated that he subsequently learned that Salvia and Marino were operating an auction in Atlantic City, doing business as East Coast Sales Demonstrations, and that he was told by Marino that Marino and Salvia had made a payoff to Somers for the license to operate that business.'
 
 
 [16]
 Although we accept (for purposes of this opinion) the appellants' characterization of the 'discrepancy' as an inconsistency, we nevertheless note that Wernikove's two statements could, in fact, be reconciled. Wernikove's testimony (that he saw money pass at the Holiday Inn) does not necessarily preclude his being told subsequently that the transfer constituted a payoff to Somers
 
 
 [17]
 On direct examination, Wernikove stated that he had 'served his time.' Appellant contends that this is inconsistent with the fact that the witness was still on probation and charges that the Government knowingly allowed false testimony to be introduced. We disagree with the assertion that there is an inconsistency, and hence need not evaluate the Government's conduct in this regard
 
 
 [18]
 Indeed, it was Wernikove who made the initial forays into Atlantic City to obtain a license for Marino's and Salvia's 'jam joint.'
 
 
 [19]
 Similarly, the Second Circuit will look askance when a recall is predicated upon information available at the time of the cross-examination. In United States v. Blackwood, 456 F.2d 526, 529-530 (2d Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972), the Court indicated that where the relevant documents are available at the time of the original cross-examination, 'deference to the trial judge's discretion (in refusing recall) should be especially broad.'
 
 
 [20]
 On cross-examination of Wernikove by Somers' counsel, the following colloquy took place:
 Q: 'Well, would you classify yourself as an con artist? A: When I was in (the jam joint business) yes. Q: That is what you were? A: Yes. Q: You would con people, coming in to buy something? A: That's right.'
 Tr. 1718.
 
 
 [21]
 Somers suggests that he would have also focused on Wernikove's prior arrests for check passing. As these acts had not resulted in convictions, they would not have been admissible. See 3A Wigmore on Evidence, 980a (1970 ed.)
 
 
 [22]
 Even if we were to accept Somers' contention that he was ignorant of the indictment, we would not have a situation in which the denial of recall constituted an abuse of discretion, for the simple reason that the evidence to be adduced would have been inadmissible. Somers' claim of bias-- based on the premise that Wernikove would favor the Government in the instant case in order to ensure a vigorous prosecution of the separate case against Marino and Salvia-- is too tenuous to be submitted to the jury. Nor could Somers use the indictment to contradict Wernikove's portrayal of his friendly relationship with Marino and Salvia. Such a contradiction would constitute impeachment on a collateral matter through the utilization of extrinsic evidence, a maneuver which is forbidden in this Circuit. See United States v. Hendrickson, 417 F.2d 225, 228 (3d Cir. 1969), cert. denied, 397 U.S. 1026, 90 S.Ct. 1271, 25 L.Ed.2d 537 (1970)
 
 
 [23]
 Tr. 4329
 
 
 [24]
 This Court has recently found prosecutorial conduct improper, but not prejudicial, in a host of cases. See, e.g., United States v. Benson, 487 F.2d 978 (3d Cir. 1973); United States v. LeFevre, 483 F.2d 477 (3d Cir. 1973); United States v. Leftwich, 461 F.2d 586 (3d Cir. 1972), cert. denied, 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178 (1972); United States v. Scalia, 464 F.2d 1301 (3d Cir. 1972), cert. denied, 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596 (1973). In other cases, prosecutorial misconduct has precipitated reversal. See, e.g. United States v. Newman and Gaca, 490 F.2d 139 (3d Cir. 1974) (prosecutorial misconduct as one element of totality of circumstances leading to reversal); cf. United States v. Small, 443 F.2d 497 (3d Cir. 1971) ('testifying' on evidence not in the record found to be extremely prejudicial); United States v. Schartner, 426 F.2d 470 (3d Cir. 1970) (see p. 740, infra)
 
 
 [25]
 Early in his opening statement, the Assistant United States Attorney stated that:
 'Nothing that I say to you or what other counsel may say to you is evidence in this case. The opening statement is an outline. Obviously we cannot offer all the proof in this case through one witness or through one document or a series of documents. The outline tells you what the charges are. It tells you also a preview of what the evidence will be so you can relate the evidence we intend to introduce in this court room to the charges that will be before you.'
 Tr. 5.
 
 
 [26]
 The appellants in particular challenge the following passages, appearing midway through the Government's opening:
 'While the indictment alleges monetary amounts extorted by these defendants, and while we prove amounts far in excess of the $28,000 alleged in the indictment, this illustrates the most shocking aspect of this case, that is, the brazen, contemptuous and calculating perversion of their public trust for their personal greed and self enrichment.
 We will prove to you beyond any reasonable doubt how these conspirators operated in league together to systematically enforce their will to corruptly, venally extract tribute from those who sought to do business in Atlantic City, New Jersey. Their greed could never be satiated. They took it from as little as $15 or $25 to a contract to $7500 in a single transaction with varying amounts in between.
 These defendants ruled Atlantic City, New Jersey as if it was their private kingdom. They enforced a total feudal system of corruption upon that society and they acted as the lords of corruption.
 We will prove beyond any reasonable doubt that these defendants knew what they were doing was wrong, that they knew what they were doing was immoral and they knew what they were doing was against the laws of the United States. Each lord played a different role in the conspiracy before you. We will prove to you what their roles were.
 Certain he never would be caught, never be brought to justice, this defendant Arthur Ponzio was brazen and arrogant in his dealings while publicly representing himself to be acting in the best interest of the people of Atlantic City, New Jersey. This Charlatan lied whenever it pleased him, secretly collected tens of thousands of dollars for himself and the other members of this conspiracy.'
 Tr. 16-17, 21.
 
 
 [27]
 Inasmuch as our discussion here is limited to opening statements, we do not decide the propriety of 'characterizing' statements used in summation
 
 
 [28]
 The defendants did not object until after the prosecutor had completed his entire opening statement. The District Court found, and the appellee contends, that the defendants waived their objections by failing to object until after the Government had completed its statement. We agree with the District Court that requiring immediate objections to improprieties in openings serves the dual purpose of forestalling further improprieties and 'curing' improper remarks while the remarks are still fresh in the minds of the jurors. In the absence of countervailing factors, it is proper for District Courts to require that objections to openings be made immediately. We do not, however, rest our decision on this ground. As the analysis above indicates, had the objection been properly raised, reversible error still would not have been present
 
 
 [29]
 In his opening, the prosecutor declared:
 'Mr. Somers served as mayor of Atlantic City and was originally selected by other members of the conspiracy, Jackson for one and a William Casey. You will hear more about him later on. Somers preceded Ponzio on the commission. Somers joined the commission and became a commissioner on January 19, 1967 where he was appointed by the other commissioners to the department of parks and playgrounds. 'Unlike some members of this conspiracy, Somers carefully insulated himself but occasionally his greed also got the better of him and brought him out front from a safe secure insulated position, and thereby he made his mistake, as we will prove to you in this case. 'We will prove to you that he used his position as commissioner of revenue and finance and later as mayor of Atlantic City, New Jersey to aid the other co-conspirators in their endeavors to collect money from firms, individuals who sought to do work in Atlantic City, New Jersey. 'We will prove to you that his greed got the better of him and he himself took money in his own hand. 'We will prove that Somers, as carefully as he was took cash directly although he carefully picked and chose which individuals and under what circumstances he would take this cash, thereby hoping to remain undetected and not to be apprehended.
 
 
 [30]
 Indeed, in United States v. Scoblick, 225 F.2d 779, 782 (3d Cir. 1955), this Court noted that the probable effect of a 'variance' between outline and proof is 'to give the jury an unfavorable impression of the case for the government
 
 
 [31]
 Defense counsel objected to the statement immediately. In response, the District Judge stated to the jury:
 'As I have indicated to you on other occasions, no inference whatsoever should be drawn from the removal of those four counts of the indictment.'
 
 
 [32]
 Each of the appellants claim that the remark made during Ponzio's closing prejudiced their own cases. We do not believe the remark could have injured any party other than Ponzio. Accordingly, we reject out of hand the claims of the other appellants and consider the remark only vis-a-vis Commissioner Ponzio
 
 
 [33]
 The indictment actually identifies the entity extorted as 'East Coast Demonstration Sales, Inc.,' rather than 'East Coast Sales Demonstration, Inc.' We reject the contention that this inadvertent transposition constitutes a fatal variance, since our reading of the record discloses no demonstration of prejudice (emanating from the clerical mistake)
 
 
 [34]
 Paragraph 5 states:
 'Between on or about January 1, 1970 and July 31, 1970, in the State and District of New Jersey, and elsewhere, the defendants herein WILLIAM T. SOMERS RICHARD S. JACKSON, ARTHUR W. PONZIO, KARLOS R. LA SANE, ROBERT GLASS, GERMAINE FISHER, AND FLORENCE CLARK knowingly, wilfully, unlawfully and feloniously, and in furtherance of the plan and purpose to commit the offense charged in Count I of this indictment, did obstruct, delay and affect commerce as that term is defined in Section 1951 of Title 18, United States Code, and the movement of material, equipment, supplies and labor in such commerce, by extortion as that term is defined in Section 1951 of Title 18, United States Code, in that:
 The defendants obtained a sum of United States Currency from the firm of East Coast Demonstration Sales, Inc., its officers and its agents, with the consent of East Coast Demonstration Sales, Inc., its officers and its agents, such consent having been induced by both the wrongful use of fear and under color of official right.
 In violation of Title 18, U.S.C., Sections 1951 and 1952.'
 
 
 [35]
 The record is unclear as to whether the July 3 date set forth in the prosecutor's letter was a typographical error
 
 
 [36]
 As noted above, trial commenced on January 15, 1973
 
 
 [37]
 At a later stage, defendant also moved on this ground for a judgment of acquittal
 
 
 [38]
 Judge Skelly Wright has defined the distinction between a variance and an amendment in the following terms:
 'An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.'
 Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1071 (1969).
 
 
 [39]
 The close resemblance to Ex parte Bain is suggested by the following passage in Stirone:
 The very purpose of the requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. Thus the basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge.
 361 U.S. at 218, 80 S.Ct. at 273.
 
 
 [40]
 A Hobbs Act violation based on extortion requires proof of the following elements: (1) that the defendant induced a victim to part with property; (2) that the victim parted with his property consensually; (3) that the inducement occurred through the wrongful use of actual or threatened force, violence, or fear or under color of official night; and (4) that, in so inducing, the defendant adversely affects interstate commerce. 1, U.S.C. 1951; see also United States v. Addonizio, supra, 451 F.2d at 59
 For the purposes of the instant case, a Travel Act violation requires proof that the defendant used a facility in interstate commerce to distribute the proceeds of an act of extortion. 18 U.S.C. 1952.
 
 
 [41]
 Our focusing upon the prejudice resulting from time variances does not differ from the approach adopted in other Circuits. See, e.g., D.C. Circuit: Cogdell v. United States, 113 U.S.App.D.C. 219, 307 F.2d 176, 178 (1962) cert. denied, 371 U.S. 957, 83 S.Ct. 515, 9 L.Ed.2d 505 (1963); First Circuit: United States v. Antonelli, 439 F.2d 1068, 1070 (1st Cir. 1971); Second Circuit: United States v. Edelman, 414 F.2d 539, 542 (2d Cir. 1969), cert. denied, 396 U.S. 1053, 90 S.Ct. 705, 24 L.Ed.2d 698 (1970); United States v. Doyle, 348 F.2d 715, 719 n. 3 (2d Cir.), cert. denied, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965); Fourth Circuit: United States v. Covington, 411 F.2d 1087, 1089 (4th Cir. 1969); Fifth Circuit: Russell v. United States, 429 F.2d 237, 238 (5th Cir. 1970); United States v. Duran, 411 F.2d 275, 278 (5th Cir. 1969); Sixth Circuit: United States v. Heard, 443 F.2d 856, 860 (6th Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971); Eighth Circuit: United States v. Arradondo, 483 F.2d 980, 984 (8th Cir. 1973); Jacobs v. United States, 395 F.2d 469, 474 (8th Cir. 1968); Whiteside v. United States, 346 F.2d 500, 504 (8th Cir. 1965), cert. denied, 384 U.S. 1023, 86 S.Ct. 1946, 16 L.Ed.2d 1025 (1966); Ninth Circuit: Riley v. United States, 411 F.2d 1146, 1153 (9th Cir. 1969), cert. denied, 697 U.S. 906, 90 S.Ct. 897, 25 L.Ed.2d 87 (1970); United States v. Retallick, 434 F.2d 990, 991 (9th Cir. 1970); Baker v. United States, 393 F.2d 604, 613 (9th Cir.), cert. denied, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106 (1968)
 
 
 [42]
 This approach is far from novel. Several courts have referred to a failure to request a continuance as an indication that a defendant has not been prejudiced by a time variance. See United States v. Antonelli, supra, 439 F.2d at 1070 ('. . . if he was surprised by the October date, he could have made a request for a continuance supported by a showing of cause.'); United States v. Edwards, 366 F.2d 853, 872 (2d Cir. 1966), cert. denied, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967); United States v. Covington, supra, 411 F.2d at 1089; Russell v. United States, supra, 429 F.2d at 238