776 F.2d 1118
 19 Fed. R. Evid. Serv. 605
 UNITED STATES of America
v.
CASTRO, Victor.
Appeal of Victor CASTRO.
UNITED STATES of America
v.
SUAREZ, Tomas. Appellant in No. 85-1132
UNITED STATES of America
v.
GARCIA-REMEDIO, Pablo.
Appeal of Pablo GARCIA-REMEDIO.
 Nos. 85-1127, 85-1132 and 85-1148.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 18, 1985.
Decided Nov. 12, 1985.
As Amended Nov. 15, 1985.
 
 Creed C. Black, Jr. (Argued), Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Victor Castro.
 Robert O'Shea (Argued), Shein & Brookman, Philadelphia, Pa., for Tomas Suarez.
 Lloyd A. Gelwan (Argued), Stephen A. Madva, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for Pablo Garcia-Remedio.
 Judy Goldstein-Smith (Argued), Asst. U.S. Atty., Edward Zittlau, Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Philadelphia, Pa., for appellee.
 Before ADAMS and JAMES HUNTER, III, Circuit Judges, and FISHER,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 Victor Castro, Pablo Garcia-Remedio, and Thomas Suarez appeal their convictions in the United States District Court for the Eastern District of Pennsylvania for offenses stemming from the attempted purchase of more than 1,000 pounds of marijuana. This appeal requires us to decide whether an asserted variation between the indictment and the evidence presented at trial violated the fifth amendment's grand jury clause, whether the evidence at trial sufficed to convict Garcia-Remedio and Suarez, and whether the trial court's instructions fairly and adequately placed Castro's entrapment defense before the jury. Subject matter jurisdiction below was based on 18 U.S.C. Sec. 3231 (1982); we have appellate jurisdiction under 28 U.S.C. Sec. 1291 (1982). We affirm.
 
 I.
 
 2
 Appellants are three of the nine defendants named in a thirteen count superseding indictment returned by a grand jury in the Eastern District of Pennsylvania on August 29, 1984. Count one of the indictment charged all nine defendants with conspiracy to possess with intent to distribute more than 1,000 pounds of marijuana, and count thirteen with the attempt to possess, with intent to distribute, more than 1,000 pounds of marijuana, both in violation of 21 U.S.C. Sec. 846 (1982). Counts two and three charged Castro with the unlawful use of a communication facility to further the conspiracy, in violation of 21 U.S.C. Sec. 843(b) (1982). Counts eleven and twelve charged Suarez with carrying a firearm during the commission of a felony, in violation of 18 U.S.C. Sec. 924(c)(2) (1982), and with the possession of an unregistered silencer in violation of 26 U.S.C. Sec. 5861(d) (1982). Count thirteen charged all nine defendants with the attempt to possess with intent to distribute more than 1,000 pounds of marijuana, also in violation of 21 U.S.C. Sec. 846 (1982).
 
 
 3
 The indictment originated in a Drug Enforcement Agency ("DEA") "reverse-sting" operation, in which DEA agents posed as sellers of large quantities of marijuana. The operation began in Texas. In the course of negotiating with prospective purchasers from the Texas area, the agents were introduced to Sebastian Ganci, a Florida restaurateur, who expressed an interest in acting as a "broker" between the agents and buyers in Florida. On February 2, 1984, Ganci attempted to negotiate a purchase of 15,000 pounds of marijuana from the DEA agents. The deal fell through, however, when the parties could not agree on the appropriate means to transport the marijuana. A second deal on February 17, 1984 also fell through, but Ganci advanced $50,000 to the agents as "good faith" money after the agents told him that they would not deal with him in the future unless they received some payment. The agents promised to credit Ganci with the money on a future transaction. After another transaction came to naught, Ganci met the agents in Houston, Texas on April 17, 1984 to discuss future dealings; Victor Castro accompanied Ganci to this meeting and was introduced to the agents as Ganci's interpreter.
 
 
 4
 The scene of the sting operation shifted to the Philadelphia area, where the DEA kept a large amount of marijuana confiscated from earlier prosecutions in a warehouse in Bristol, Pennsylvania. On May 3, 1984, agents met with Ganci and Castro at the Mid-Town Holiday Inn in Philadelphia to discuss arrangements for the sale of some of this marijuana. On May 5, 1984, agents met with Ganci, Castro, and Ricardo Iglesias at the Imperial Inn in Bristol; Ganci and the agent examined the marijuana in the warehouse, and Iglesias, a representative for the buyers, agreed to purchase between 2,500 and 4,500 pounds. The agents told Ganci that they would deduct the $50,000 credit from the purchase.
 
 
 5
 On May 17, 1984, DEA agents met with Ganci, Iglesias and other men introduced as buyers and their employees, at the Marriott in Philadelphia. Iglesias took one of the agents to the Marriott parking lot, where Iglesias opened the trunk of a Cadillac and showed the agent two briefcases containing what Iglesias represented to be $580,000 for the downpayment on the marijuana. Agents accompanied the buyers to Bristol to close the deal, but after the parties could not agree on how the money would be delivered, the buyers called off the deal. Realizing that closing the Bristol transaction was temporarily, if not permanently, impossible, the agents proceeded to arrest the suspects they believed to be involved in the deal.
 
 
 6
 Back at the Marriott, agents watching Iglesias's Cadillac observed Suarez sitting in the driver's seat of a car parked directly across from the Cadillac, apparently guarding the money. As the agents approached Suarez to arrest him, they saw him reach beneath his seat. The agents ordered Suarez out of the car and searched him; a subsequent search of the car revealed a loaded automatic pistol with a silencer concealed beneath the driver's seat. Agents arrested Iglesias and Garcia-Remedio as they left Iglesias's room at the Marriott. Two months later, DEA agents arrested Castro in Miami.
 
 
 7
 Count one of the superseding indictment charged that all of the defendants "[f]rom in or about January 1984, to on or about May 17, 1984, at Philadelphia and Bucks County, in the Eastern District of Pennsylvania, and elsewhere" conspired to possess, with intent to distribute, a quantity of marijuana exceeding 1,000 pounds. The indictment specified twenty-four separate overt acts, of which ten relate to the aborted transactions outside Pennsylvania. The Government took the position at trial that all of Ganci's activities related to a single conspiracy, and that the Bristol transaction represented merely the concluding episode in the conspiracy. The trial court rejected this construction, however, and instructed the jury that the defendants could only be found guilty if they conspired to possess the Bristol marijuana. On December 12, 1984, a jury convicted Suarez and Garcia-Remedio on all counts against them, and returned a guilty verdict against Castro on those counts against him except the attempted possession charge.
 
 II.
 
 8
 All of the defendants in this appeal maintain that the conspiracy charged in the indictment impermissibly varied from the one the government proved at trial. We noted in United States v. Somers, 496 F.2d 723, 743 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974) that two types of variations between the indictment and evidence exist: amendments, which occur when the charging terms of the indictment are altered, and variances, where the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment. Somers, 496 F.2d at 743 n. 38 quoting Gaither v. United States, 413 F.2d 1061, 1071 (D.C.Cir.1969).[1] The difference between these variations is not merely academic, for we observed that Supreme Court precedent indicated that if the variation were characterized as an amendment, it would constitute a per se violation of the fifth amendment's grand jury clause.[2] Somers, 496 F.2d at 743. Variances, however, are subject to less strict case-by-case inquiry, and would only constitute reversible error in those cases where the variance prejudiced the defendant's defense. Id. at 743-44. Our analysis led us to conclude that:
 
 
 9
 in evaluating variances, we must first determine whether there has been a modification in the elements of the crime charged.... If such a modification exists, we will apply the per se rule of Stirone [Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) ] so as to preserve the shielding function of the grand jury. If, on the other hand, the variance does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant....
 
 
 10
 Somers, 496 F.2d at 744 (citations omitted).
 
 
 11
 The Supreme Court recently confirmed such an analysis in United States v. Miller, --- U.S. ----, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). In Miller, the grand jury charged Miller with defrauding his insurer by consenting to a burglary of his salvage company and subsequently claiming the losses from the burglary in excess of the value of the stolen property, both acts in violation of 18 U.S.C. Sec. 1341 (1982). At trial, however, the government only presented proof related to the latter allegation. Although the government moved to strike the part of the indictment alleging prior knowledge of the burglary, Miller's counsel objected to the change, and the court sent the entire charge to the jury. The jury found Miller guilty, and Miller appealed, asserting that the variance between the indictment and the proof at trial violated the fifth amendment's grand jury guarantee.
 
 
 12
 The Court began its analysis by noting that the evidence at trial "was clearly sufficient" to support Miller's conviction. Id. at 1813. The Court next focused on whether the indictment properly gave notice of the crime for which Miller was convicted, and was sufficient to allow Miller to plead his conviction as a bar to subsequent prosecutions. The Court concluded that both notice and double jeopardy concerns were met. The indictment properly alleged violations of 18 U.S.C. Sec. 1341 and fully and clearly set out the theories by which the acts alleged constituted violations. Miller, 105 S.Ct. at 1814. The evidence presented at trial clearly conformed to one of those theories, such that "[c]ompetent defense counsel certainly should have been been on notice that the offense was charged and would need to be defended against" and therefore, that "there can be no showing here that Miller was prejudicially surprised at trial by the absence of proof concerning his alleged complicity in the burglary." Id. Moreover, "[t]he indictment was also sufficient to allow Miller to plead it in the future as a bar to subsequent prosecutions." Id.
 
 
 13
 The Court then distinguished those cases where it sustained the convictions from those in which the variance constituted reversible error. "Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." Miller, 105 S.Ct. at 1815. Thus, those offenses "unnecessary to and independent from allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.' " Id., quoting Ford v. United States, 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed.2d 793 (1927). On the other hand, the Court read Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), as stating the rule that where "trial evidence had 'amended' the indictment by broadening the possible bases for conviction from that which appeared in the indictment," Miller, 105 S.Ct. at 1816 (emphasis in original), the variance destroys the defendant's " 'substantial right to be tried only on charges returned by a grand jury.' " Id. at 1817, quoting Stirone, 361 U.S. at 218-19, 80 S.Ct. at 273-74. Thus, conviction on only one of the crimes alleged in the indictment did not deprive Miller of any substantial right. Id.
 
 
 14
 Although this case presents a variance between the indictment and the evidence produced at trial, we find that the variation did not broaden the bases for conviction, but instead narrowed the scope of the evidence to prove an offense included in the indictment. Our standard of review of the jury verdict is whether there was substantial evidence, viewed in the light most favorable to the government, to support defendants' conviction. United States v. Fischbach & Moore, Inc., 750 F.2d 1183, 1189 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). Our discussion in Part III, infra, leads us to conclude that the evidence proved at trial sufficed to convict all appellants of conspiracy and Suarez and Garcia-Remedio of attempt to possess the marijuana with intent to distribute. Although the indictment avers events that occurred in Texas and Florida relating to prior attempts by Ganci, Castro, and others not indicted to purchase marijuana, the remaining averments are clearly sufficient to support a jury finding of conspiracy and attempt to purchase marijuana in Bristol, Pennsylvania. As in Miller, the indictment fully and clearly set forth the theories by which the defendants violated 21 U.S.C. Sec. 846, and the evidence at trial conformed to the theory of a conspiracy to purchase the Bristol marijuana set out in the indictment. The indictment clearly gives notice to competent defense counsel that they would have to defend against the charge that defendants conspired to purchase the Bristol marijuana.[3] Those offenses occurring in Texas and Florida are properly characterized as unnecessary to the conspiracy proved at trial. Thus, we find no notice concerns present that prejudiced appellants.
 
 
 15
 Appellant Castro contends, however, that the variance exposes him to prosecution in Texas for the same crime. We disagree. The definition of the "same crime" often give courts difficulty, but we find its articulation relatively easy in the instant case. The scope of the double jeopardy bar is determined by the conviction and the entire record supporting the conviction. United States v. Jackson, 344 F.2d 158, 160 (3d Cir.1965). In United States v. Feldon, 753 F.2d 276 (3d Cir.1985), we recently observed:
 
 
 16
 To support a claim of double jeopardy, it must be shown that the two offenses charged are in law and in fact the same offense. United States v. Ewell, 383 U.S. 116, 124, [86 S.Ct. 773, 778, 15 L.Ed.2d 627] (1966). "Offenses are not the same merely because they arise out of the same general course of criminal conduct, 'they are the same only when the evidence required to support a conviction upon one of [the indictments] would have been sufficient to warrant a conviction upon the other.' " (citations omitted).
 
 
 17
 Feldon, 753 F.2d at 278; see Brown v. Ohio, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977) (emphasizing that double jeopardy bar may be raised when the same act constitutes a violation of two distinct statutory provisions). We believe Castro may rely upon the record to raise a double jeopardy bar if the government attempts to prosecute him of conspiring to possess the Bristol marijuana based upon his conduct in Texas and Florida. The record shows clearly that the jury found that Castro conspired to possess the Bristol marijuana, and that the evidence supporting his conviction could not be sufficient to warrant a conviction based upon the failed transactions outside Pennsylvania.
 
 
 18
 Thus, under Miller, we would uphold appellants' convictions. Appellants correctly observe, however, that Miller left open the question of prejudice that occurs when the indictment charges an overarching "wheel" conspiracy[4] but the proof only goes to a series of discrete conspiracies. Appellants argue that because the trial evidence concerned a number of separate conspiracies to purchase marijuana, Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), requires us to reverse the jury's finding. In Kotteakos, the indictment named thirty-two defendants in a conspiracy to obtain loans under a Federal Housing Administration program based upon fraudulent applications. The only connection the government proved between the defendants was their common use of co-defendant Simon Brown, who processed the loan applications, knowing that the applications contained fraudulent information. At trial, the government presented evidence of at least eight separate conspiracies, with Brown at the center of each, but the trial court instructed the jury that they could convict only if they found a single, overarching conspiracy between the defendants. Id. at 767, 66 S.Ct. at 1249. Concluding that although the defendants may have violated the law, it was "not the criminality of [the] mass conspiracy" charged, id. at 773, 66 S.Ct. at 1252, but rather a number of separate conspiracies, the Court reversed the defendants' convictions. Kotteakos v. United States, 328 U.S. at 777, 66 S.Ct. at 1253; cf. United States v. Camiel, 689 F.2d 31 (3d Cir.1982).
 
 
 19
 We believe that appellants' reliance upon Kotteakos is misplaced. In the instant case, only one conspiracy was proved, a conspiracy with all the actors united in a common goal, i.e., obtaining possession of the Bristol marijuana. Although the government initially attempted to link all the conduct alleged in the indictment to one ongoing conspiracy, the district court alerted the prosecution on the first day of trial that its evidence could only go to the specific conspiracy to purchase the Bristol marijuana. The court did allow testimony of Ganci's preliminary negotiations with the DEA agents; however, it instructed the jury that this evidence could be considered only as background to the case against Garcia and Castro, and that it could only find the defendants guilty if they conspired to possess the Bristol marijuana.[5] In so doing, the court properly struck those portions of the indictment that did not involve all the defendants in a single conspiracy.
 
 III.
 
 20
 Appellants Suarez and Garcia-Remedio maintain that the government's trial evidence was insufficient to establish their involvement in the conspiracy. On appeal, the evidence of Suarez's and Garcia-Remedio's participation in the conspiracy and attempt must be considered in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); see United States v. Fischbach & Moore, Inc., 750 F.2d at 1189; United States v. Leon, 739 F.2d 885, 890-91 (3d Cir.1984); United States v. Provenzano, 620 F.2d 985, 999 (3d Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). A review of the record compels us to hold that the evidence sufficed to link these defendants to the crimes.
 
 
 21
 Agents observed Suarez meeting with Garcia-Remedio, Ganci, and co-defendant Fernando Perez-Oliva after Ganci's breakfast meeting with DEA agents at the Marriott on the morning of May 17. When Iglesias and the other buyers called off the deal, agents approached Garcia-Remedio in the Marriott lobby to inquire about Iglesias's actions. Garcia-Remedio told the agents that he did not know what was bothering Iglesias, that the transaction was Iglesias's deal, and that he and "his people" had just accompanied Iglesias to be involved in the deal. Alex Biscuiti, a buyer who accompanied the agents to Bristol, told the agents that "his man" Pablo was watching out for his interests at the Marriott. At the Marriott, agents watched Suarez sitting in the driver's seat of a car facing the Iglesias's Cadillac for over thirty minutes. When the agents approached Suarez, they saw him reach beneath his seat, where the agents found the automatic pistol with a silencer. We believe this evidence more than suffices for the jury to conclude that Pablo Garcia-Remedio accompanied Iglesias and the buyers to protect their money and Garcia-Remedio delegated to Suarez the responsibility for assuring the well-being of Iglesias's "downpayment."
 
 
 22
 Garcia-Remedio also challenges the admission of Biscuiti's statement, maintaining that the court should not have admitted Biscuiti's statement under Federal Rule of Evidence 801(d)(2)(E), the coconspirator exception to the hearsay rule, because neither Biscuiti's nor Garcia-Remedio's participation in the conspiracy had been established prior to the admission of Biscuiti's statement. This rule excludes from the definition of hearsay any out-of-court statement that is "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Exactly how much independent evidence of the conspiracy must be demonstrated before a coconspirator's statement may be admitted, however, has been the subject of some difficulty. S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 502 (3d ed. 1982). In this circuit, we have held that the government generally must establish the existence of the alleged conspiracy and the connection of both the hearsay declarant and the defendant to the conspiracy by a preponderance of the evidence prior to the admission of the statement. See United States v. Inadi, 748 F.2d 812, 816-17 (3d Cir.1984), cert. granted --- U.S. ----, 105 S.Ct. 2653, 86 L.Ed.2d 271 (1985); United States v. Ammar, 714 F.2d 238, 245 (3d Cir.), cert. denied, Stillman v. U.S., 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); Provenzano, 620 F.2d at 999; cf. United States v. Continental Group, 603 F.2d 444, 456-57 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980) (upholding trial court's admission of co-conspirator's statements subject to later proof of requisite conspiracy in complex case with a "large amount of interrelated testimony"). This appears to be the standard in most circuits. S. Saltzburg & K. Redden, supra at 506; see United States v. Gibbs, 739 F.2d 838, 843 n. 11 (3d Cir.1984) (in banc), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985). The necessary quantity of evidence to show participation need not be great; we have previously held that the trial judge's determination need only be supported by "slight" evidence. Provenzano, 620 F.2d at 999 quoting United States v. Schoenhut, 576 F.2d 1010, 1027 (3d Cir.), cert. denied, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978) and United States v. Fried, 576 F.2d 787, 793 (9th Cir.), cert. denied, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). We believe that the evidence sufficed to connect both Garcia-Remedio and Biscuiti to the conspiracy before the court admitted Biscuiti's statement. Agent Bradley testified that after he instructed John Tribiano to drive his truck to the Imperial 400 Motor Lodge in Bristol to take delivery of the marijuana, Bradley met with Ganci, Tribiano, and Alex Biscuiti at Bradley's motel room.[6] Bradley further testified that when it appeared that the transaction would not be completed because the agents had not received the money, Biscuiti "became agitated and complained loudly that it was taking too long and he was worried about his money." Although this evidence is scarcely overwhelming, it is enough to show Biscuiti's participation in the conspiracy. Given the evidence concerning Garcia-Remedio's meeting with Ganci, Suarez, and Perez-Oliva and Garcia's admission to the DEA agents that he and "his people" were involved in Iglesias's deal, we believe that the evidence also sufficed to show Garcia-Remedio's connection to the conspiracy.
 
 
 23
 Garcia-Remedio also argues that Biscuiti's statement cannot be construed as a statement "in furtherance of the conspiracy" as required by Federal Rule of Evidence 801(d)(2)(E). In Ammar, we held that statements that "provide reassurance, serve to maintain trust and cohesiveness between [the conspirators], or inform each other of the current status of the conspiracy," further the ends of the conspiracy. Ammar, 714 F.2d at 252. Biscuiti's statement to Agent Bradley that "his man" Pablo was protecting his interests at the Marriott certainly served to provide reassurance to Ganci and Tribiano, who we assume also were interested in the status of the deal.
 
 
 24
 Suarez, for his part, contends that the evidence only established his presence at the Marriott on May 17, and relies on United States v. Butts, 704 F.2d 701 (3d Cir.1983), in maintaining that his presence alone is insufficient to support his conviction. We believe that this case is readily distinguishable. In Butts, federal agents arrested defendant Cheyenne Morgan solely because he was a passenger in the back seat of a car which two co-defendants under investigation approached. We reversed Morgan's conviction because we found that Morgan's presence in the car, without more, did not constitute probable cause to arrest. In light of the evidence the government produced to show Suarez's participation in the transaction, we cannot say that the DEA agents lacked probable cause to arrest Suarez.[7]
 
 IV.
 
 25
 A major portion of Castro's defense centered on his claim that the DEA entrapped him in the conspiracy, that he had no predisposition to dealing in drugs, and his participation in the conspiracy was entirely due to the agents' inducement. See United States v. Jannotti, 673 F.2d 578, 597 (3d Cir.) (Jannotti I ), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) ("[e]ntrapment occurs when a defendant who was not predisposed to commit a crime does so as a result of the government's inducement.") Castro's counsel submitted four separate instructions on entrapment, two on inducement, and one each on the issues of predisposition and susceptibility. Castro now contends that the trial court's entrapment instructions were inadequate, and failed to submit to the jury the "essence of the defense."
 
 
 26
 After the court instructed the jury on the burdens of proof and the scope of the conspiracy, Castro's counsel reminded the court that it had neglected to instruct the jury about his client's entrapment defense. The judge corrected this oversight by giving the following instruction:
 
 
 27
 I may have overlooked a defense which has been asserted by defendant Castro. As I understand it, one of Mr. Castro's positions is that he was entrapped into acting as a translator. In short, he was simply accompanying Mr. Ganci with no intention to get involved in any criminal activity, that it was not until he met with the Government, the undercover Government agent, in Mr. Ganci's presence in Texas that anything about marijuana came up and that it was the Government agent's urging of how helpful it would be to have him act as an interpreter that initially got him into this transaction.
 
 
 28
 If you conclude that Mr. Castro was not acting as an interpreter with knowledge that this was a marijuana transaction that was being discussed until after the Government agent urged him to act as translator or encouraged him to act as translator, that it was only as a result of the Government's urging that he initially began acting as a translator in order to help out Mr. Ganci with the Government agent, then the Government would be required to prove beyond a reasonable doubt that Mr. Castro was predisposed to that kind of activity before he could be convicted.
 
 
 29
 There is no evidence that Mr. Ganci [sic] was predisposed to drug activities before he got down to Texas, and so the issue for you really is: do you conclude that Mr. Castro knew that he was acting as an interpreter in a drug transaction without regard to the statements by the Government agent? In other words, do you interpret the evidence as establishing that Mr. Castro was voluntarily and without any urging from the Government acting as an interpreter in the transaction?
 
 
 30
 Depending upon how you resolve that, you would dispose of the entrapment defense as to Mr. Castro.
 
 
 31
 In reviewing the district court's instruction, we must determine if the court abused its discretion in refusing to use Castro's proposed instructions. In evaluating the charge given, we determine whether the instruction, viewed as a whole in the light of the evidence, fairly and adequately submits the issues to the jury. See United States v. Fischbach & Moore, Inc., 750 F.2d at 1194. Despite Castro's claims to the contrary, we are unable to discover any abuse of discretion by the trial court in failing to use the exact wording on the entrapment instructions drafted by counsel. Although the court inadvertantly substituted Ganci's name for Castro when it instructed the jury on predisposition, we are more than satisfied that the instructions, taken as a whole, fairly and adequately submitted the entrapment issue to the jury.
 
 
 32
 Castro argues that he was entitled to an instruction concerning his own susceptibility to inducement, however. In accordance with United States v. Hill, 655 F.2d 512 (3d Cir.1981), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984), the lower court permitted Castro to introduce the expert testimony of a psychologist who examined Castro after his arrest. This testimony indicated that Castro was more susceptible to inducement than the average individual. Although the court refused to instruct the jury regarding Castro's particular susceptibility to inducement, neither did the court instruct the jury to ignore the psychologist's testimony. We have no reason to believe that the jury evaluated the psychologist's testimony in a different manner than it did that of the other witnesses. The district court did not abuse its discretion in refusing to instruct the jury concerning Castro's susceptibility to inducement.
 
 
 33
 Castro also argues that the trial court erred by failing to give a burden of proof instruction on the inducement component of his entrapment defense, although it gave one on the predisposition element. He is correct that once the court decides to give an entrapment charge, the court must instruct the jury that the government must prove beyond a reasonable doubt both that the defendant was not induced by the government to commit the crime and that he was predisposed to commit the crime. United States v. Jannotti, 729 F.2d 213, 224 (3d Cir.1984) (Jannotti II), cert. denied, --- U.S. ----, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1985). Further, "[f]ailure to place this burden exclusively on the government will not be cured by the presence of a general charge that the government has the burden of proving the defendant's guilt beyond a reasonable doubt." Id.
 
 
 34
 Castro did not preserve properly his objection to the erroneous instruction, however, and this court therefore may review the matter only to assure that "plain error" was not committed. United States v. Bey, 736 F.2d 891, 895 (3d Cir.1984). Federal Rule of Criminal Procedure 30 provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." In our opinion, the defendant does not meet this strict standard.
 
 
 35
 At the trial, the judge's initial instructions did not mention the entrapment defense. In a side-bar conference following the jury charge, Castro's attorney reminded the judge of his promise to give a charge on entrapment, and noted that the instruction should place on the government "the burden of proving beyond a reasonable doubt [Castro] was not entrapped." The judge then gave the challenged instruction, and the attorneys approached the bench again. Castro's counsel objected specifically only to the confusion of names in the charge. He then asked, "Do I understand the Court's failure to charge the points for charge it did not mention are preserved?" and the court responded simply, "Yes."
 
 
 36
 Castro's proposed charge did include a proper statement of the burden of proof, but reference to a requested instruction does not satisfy Rule 30's specificity requirement. United States v. Byrd, 542 F.2d 1026, 1028 (8th Cir.1976) (per curiam). This is not a case in which counsel's broad objection followed directly a discussion in which numerous disputed points were mentioned, such that the appellate court can infer that the judge considered the subject matter of each preserved objection. See United States v. Agnes, 753 F.2d 293, 301 n. 11 (3d Cir.1985).
 
 
 37
 The specificity requirement is not mere formalism. Without a sufficient objection, the trial judge is not apprised adequately of the disputed matter and of the need to take corrective action to avoid a new trial. United States v. Graham, 758 F.2d 879, 883 (3d Cir.), cert. denied, Kirby v. U.S., --- U.S. ----, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985). Here, the trial judge responded to the request for an entrapment instruction with a charge that included reference to the government's burden of proof. Had he been informed subsequently of the discussion concerning burden of proof instructions in Jannotti II or other decisions, it is reasonable to assume that he would have made a correction. Counsel's silence, however, denied him such notice, and instead allowed him to assume that his instruction satisfied the burden of proof portion of the defendant's earlier request.
 
 
 38
 Turning to the question of whether the instruction nevertheless constituted plain error, we begin with the Supreme Court's admonition that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). To find plain error pursuant to Federal Rule Criminal Procedure 52(b), the mistake need be so clear that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).
 
 
 39
 Castro fails to meet this rigorous standard. First, the error did not affect the defendant's constitutional rights, as the entrapment defense "is not of a constitutional dimension," United States v. Russell, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), and no other constitutional right was affected by the burden of proof instruction. See Jannotti II, 729 F.2d at 225.
 
 
 40
 Second, the instruction did not produce "a miscarriage of justice." Graham, 758 F.2d at 883. While a trial judge's charge on the government's overall burden does not excuse a failure to instruct specifically on the burden in an entrapment defense, the general charge is indicative of a lack of plain error. United States v. Conversano, 412 F.2d 1143, 1149 (3d Cir.), cert. denied, 396 U.S. 905, 90 S.Ct. 219, 24 L.Ed.2d 181 (1969); see United States v. Martinez-Carcano, 557 F.2d 966, 969 (2d Cir.1977); see also United States v. Walden, 578 F.2d 966, 971 (3d Cir.1978) (court must review charge as a whole in determining plain error), cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979). In the case before us, the judge repeatedly referred to the government's overall burden and to the presumption of the defendant's innocence and instructed the jury as to the government's burden on the predisposition issue; Castro therefore was not unduly harmed by the court's failure to give a burden of proof instruction on the inducement component.
 
 
 41
 Moreover, our review of the record reveals that the evidence at trial did not present a strong case for entrapment. This is not to suggest that once a trial judge has agreed to give unnecessary instructions, any charge, however incorrect, is acceptable. Rather, we simply believe that the weakness of Castro's entrapment claim in this case is a strong indication that the erroneous instruction did not produce a trial marred by plain error. See United States v. Levin, 443 F.2d 1101, 1107 (8th Cir.), cert. denied, 404 U.S. 944, 92 S.Ct. 297, 30 L.Ed.2d 260 (1971); Hart v. United States, 396 F.2d 243, 246-47 (8th Cir.1968), cert. denied, 393 U.S. 1033, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969). Castro may have been, as the psychologist testified, quite susceptible to inducement, but the evidence indicates clearly that he was drawn into the conspiracy by Ganci, not government agents. The agents' subsequent encouragement, if any, of Castro's continued participation is minor in comparison with Ganci's actions. Castro's mental state is relevant in a criminal prosecution for conspiracy, but it is not dispositive of an entrapment defense, which also focuses on improper government conduct.
 
 
 42
 Because no specific objection was made to the burden of proof instruction, and because the charge does not present plain error, we find no merit in Castro's contention on this aspect of the charge.
 
 V.
 
 43
 For the reasons discussed above, we will affirm the judgment of the trial court.
 
 
 
 *
 Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 In Gaither, Judge Wright went on to explain:
 An amendment is thought to be bad because it deprives the defendant of his right to be tried upon the charge in the indictment as found by the grand jury and hence subjected to its popular scrutiny. A variance is thought to be bad because it may deprive the defendant of notice of the details of the charge against him and protection against reprosecution.
 Gaither, 413 F.2d at 1071-72 (citations omitted).
 
 
 [2]
 "No person shall be held to answer to a capital, or otherwise infamous crime, unless upon presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." U.S. Const. amend. V, cl. 1. Federal Rule of Criminal Procedure 7(a) clarifies the grand jury clause, providing that an indictment is required for federal capital crimes and federal offenses punishable by prison terms exceeding one year or involving hard labor
 
 
 [3]
 The indictment charged that:
 From in or about January 1984, to on or about May 17, 1984, at Philadelphia and Bucks County, in the Eastern District of Pennsylvania, and elsewhere, defendants ... knowingly, intentionally, and unlawfully did conspire, combine, confederate and agree together and with each other, and with other persons known and unknown to this Grand Jury, to possess with intent to distribute a quantity of marihuana exceeding 1,000 pounds, a Schedule I non-narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Section 841(b)(6).
 In furtherance of this conspiracy, the following persons did do and perform the following overt acts within the Eastern District of Pennsylvania and elsewhere....
 The indictment then lists 24 overt acts, fourteen of which directly concern the conspiracy to possess the Bristol marijuana.
 Moreover, competent counsel would be on notice from the first day of trial that the government would be limited in its presentation of evidence to prove the conspiracy and attempt to purchase the Bristol marijuana. The record reveals that the court cautioned the government "not to try to prove this conspiracy by proving other conspiracies," and stated its position that while background evidence concerning defendants' activities before they joined the conspiracy would be admissible "what is to be guarded against is the proof of some other conspiracy."
 
 
 [4]
 The "wheel" conspiracy describes an arrangement of co-conspirators around a central figure, or "hub," who deals separately with peripheral figures, or "spokes." Each of the spokes is a member of the conspiracy even though they may not have any direct relations with one another. These peripherial members must have been aware of one another and have done something in furtherance of a single, illegal enterprise, however, or it is said that the conspiracy alleged lacks "the rim of the wheel to enclose the spokes." Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946); see Blumenthal v. United States, 332 U.S. 539, 556-57, 68 S.Ct. 248, 256-57, 92 L.Ed. 154 (1947). Appellants here believe that the government presented evidence of a wheel conspiracy with Ganci at the hub
 
 
 [5]
 The court instructed:
 [I]t is necessary for the Government to prove to your satisfaction beyond a reasonable doubt that in fact there was an agreement, an understanding, that this marijuana in excess of 1,000 pounds would be possessed, that it was the intent of the parties to the agreement that the marijuana would be possessed by a member of the conspiracy.
 When I say "the marijuana," what do I mean? I mean the marijuana which was located in the Bristol warehouse.
 You heard a lot of evidence about negotiations in Texas and Florida having to do with the possibility of obtaining possession of marijuana in those locations. That evidence is not to be considered by you in connection with any of the defendants except Mr. Ganci and Mr. Castro. And as to them, they cannot be convicted in this case even if you should conclude that they did in fact have a conspiracy to possess the marijuana that was down in Texas or the marijuana that was supposed to be in Florida.
 The evidence concerning those transactions is simply background. It is simply to detail for you the initial involvement of Mr. Ganci and Mr. Castro in the conspiracy which is charged; namely, the conspiracy alleged to relate to the marijuana that was located in Bristol.
 ....
 So it is very important that you understand that regardless of what conclusions you may reach as to whether they did or did not have some criminal involvement in transactions or potential transactions in Texas and Florida, they cannot be convicted here on the basis of any such activity.
 In this case your attention must be focused and limited to the alleged attempt to buy the marijuana that was located in Bristol, Pennsylvania.
 These instructions sharply contrast with the trial court's instructions in Kotteakos, where the court told the jury that they must find that the evidence of the separate conspiracies proved a single conspiracy, as charged in the indictment:
 The indictment charges but one conspiracy, and to convict each of the defendants of a conspiracy the Government would have to prove, and you would have to find, that each of the defendants was a member of that conspiracy. You cannot divide it up. It is one conspiracy, and the question is whether or not each of the defendants, or which of the defendants, are members of that conspiracy.
 Kotteakos, 328 U.S. at 750, 66 S.Ct. at 1239.
 
 
 [6]
 Although both Alex Biscuiti and John Tribiano were indicted, they were not apprehended before trial
 
 
 [7]
 Suarez also claims that there was insufficient evidence to convict him of carrying a firearm during the commission of a felony, although he concedes that the evidence sufficed to convict him on charges of possessing an unregistered silencer. Like the defendant in United States v. Barber, 594 F.2d 1242 (9th Cir.1979), Suarez urges that the word "carries" connotes the concept of actual possession or, at most, the transportation of the gun. We believe that the evidence sufficed to show possession of the weapon, as the agents found the gun underneath the seat where Suarez was sitting, clearly within his physical control. We agree with the Barber court that "[n]othing in the legislative history indicates that Congress intended any hypertechnical or narrow reading of the word 'carries.' " Barber, 594 F.2d at 1244