**UNITED STATES of America**

v.

**Thomas Otis EATON.**

**Crim. No. 87–00080–P–01.**

United States District Court, D. Maine.

March 4, 1988.

Richard S. Cohen, U.S. Atty., William H. Browder, Micholas M. Gess, Asst. U.S. Attys., Portland, Me., for plaintiff.

David C. Pomeroy, Portland, Me., for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

On September 22, 1987, Defendant Thomas Eaton was indicted by the Grand Jury in Portland, Maine. The indictment, in three counts, charged conspiracy to possess with intent to distribute in excess of five hundred grams of a substance containing cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846; possession with intent to distribute in excess of five hundred grams of a substance containing cocaine in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2; and use or carrying of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). A trial was held without a jury [1] on February 17 and 18, 1988.

Much of the evidence of the conspiracy was provided by Government witness Tod E. Alexander,[2] a co-conspirator who pled guilty and has already been sentenced by the Court. It was corroborated by the testimony of various police officers who managed the confidential informant and monitored his controlled purchases of cocaine from Alexander.

### Counts I and II

Alexander testified that on Saturday, September 12, 1987, he met the confidential informant, whom he knew as "Jim," at the Cumberland Farms on Pleasant Street in Brunswick. "Jim" asked if Alexander could procure a pound of cocaine. Alexander spoke to the Defendant at the apartment they shared, and Defendant said he would have to find out the price for a pound from one Greg Couture. On Sunday afternoon Defendant told Alexander that the price would be $25,000. Defendant told Alexander that they would each earn between $500 and $1000 on the transaction. Alexander relayed this information to "Jim" and on that day mediated a purchase by "Jim" from Defendant of a sample "eight-ball," one-eighth of an ounce, for $300. Alexander gave the money to Defendant, who went away for approximately an hour and returned with the cocaine, which he gave to Alexander. In a transaction between Alexander and "Jim," which was observed and monitored electronically by the police officers who testified, "Jim" approved the sample when it was delivered to him by Alexander and plans were made to consummate a larger transaction on Monday. Sometime on Sunday "Jim" asked Alexander what the price of a kilogram would be. Alexander asked Defendant, who responded on Monday that a kilogram would cost $45,000.

1. Defendant waived trial by jury in writing on November 25, 1987, and again orally before the start of trial on February 17, 1988.

2. At the outset the Court will state that having assessed the testimony of Alexander with great care and caution, as it instructs juries to do with the testimony of cooperating coconspirators, it finds that testimony highly credible. Alexander testified for the better part of the first day of trial so the Court had ample opportunity to assess his demeanor, which at all times conveyed a sense of credibility. The Court finds that Defendant's attempts to impeach Alexander did not undercut in any way his appearance of testifying truthfully in this matter. The Court is secure in its finding because many of the details of Alexander's testimony were corroborated by the testimony of the police officers who monitored the various transactions.

According to Alexander's testimony, as corroborated by the observations and electronic monitoring of "Jim" by law enforcement officials, late Monday afternoon, after telephone arrangements had been made by Alexander and "Jim," there was a flurry of activity in the Cook's Corner area of Brunswick. Defendant drove Alexander in his truck to the Cumberland Farms store and parked. Alexander then walked to meet "Jim" who was in his car at the Atrium Hotel. Alexander was shown $50,-000 in small bills by "Jim," and he told "Jim" that he and Defendant would sell a kilogram. Alexander also told "Jim" that he would have to take the money to Defendant, who would then provide the cocaine, but "Jim" refused to let the money go without getting the "product" immediately. When informed of this refusal, Defendant similarly refused to produce the cocaine without the money in hand. After more negotiating, which was accomplished by Alexander walking back and forth between the two vehicles and conferring alternately with "Jim" and the Defendant, it was finally agreed that the deal for a kilogram of cocaine would take place on Route 201 in Topsham near Roller World. Defendant was to go to where the cocaine was and then meet Alexander and "Jim" at 8:00 p.m., but he did not show up. When Alexander telephoned Defendant at their apartment, Defendant said the cocaine was not available and the deal would have to wait until the next day.

On Tuesday, "Jim" told Alexander that he wanted to do the deal that night. When Alexander relayed that message to Defendant, he agreed. Alexander arranged the deal by means of phone calls between himself and "Jim" and conversations with the Defendant, who, with the person he was dealing with, made the final logistical decisions. For a while it appeared to Alexander and the police officers monitoring the conversations that the deal was off because, as Agent Langella testified, Alexander did not want to provide a sample of the cocaine which he said was wrapped in duct tape.

Finally, after a fourth phone call, Alexander and "Jim" decided to go through with the deal and to follow the same procedure as on the previous night. "Jim" picked Alexander up and they drove to Roller World on Route 201, where, following the plan, Alexander left "Jim's" car and walked north 200 yards to where Defendant was parked in his truck. Alexander got a small sample of cocaine from Defendant, who said he would have the cocaine within a few minutes after Alexander gave the sample to "Jim" and returned to Defendant's truck with the money. Alexander walked back to Roller World, entered "Jim's" car to give him the sample, and was arrested by officers who had been hiding at the site waiting for "Jim's" signal that the cocaine had been transferred. At the turnaround, officers who had been observing Defendant's truck arrested him when they learned that the sample of cocaine had been transferred from Alexander to "Jim."

The Court finds that Defendant got the cocaine sample from Greg Couture. Officer Lehan testified that he surveilled Defendant's truck on the night in question and that at about 7:30 p.m. the truck left the turnaround near Roller World and went to another turnaround somewhat farther north where a black Corvette was parked. Defendant parked his truck with the driver's side door next to the driver's side door of the Corvette, and the two vehicles remained in that position for about a half-hour, being observed by Officer Lehan several times during that period. A little after 8:00 p.m. Defendant's truck left. After Defendant had been arrested at the next turnaround, Officer Lehan returned to the northerly turnaround and found the Corvette still there. When asked to identify himself, the driver of the Corvette said he was Greg Couture and produced his driver's license in that name.

According to Lehan's testimony, Couture's car was searched by the officers, but nothing was found. After Couture had left the northerly turnaround, however, officers found a kilogram of well-wrapped cocaine hidden near a tree, down an embankment, about ten feet from where Couture's car had been. The package of cocaine was

sealed with duct tape and had a small rectangular piece cut out of it, presumably to allow extraction of the samples.

Officer Lehan testified that he remained in the area and at 1:25 a.m., about five hours after the arrests of Defendant and Alexander, Mark Couture, Greg Couture's brother, walked into the remote turnaround with a flashlight. Going directly to the spot where the cocaine had been hidden, he picked up the bag. He was arrested, but ultimately not charged with any offense.

The Court of Appeals for the First Circuit has recently reaffirmed the elements of a conspiracy charge:

> The gist of conspiracy is an agreement to disobey or to disregard the law. Two types of intent must be proven: intent to agree and intent to commit the substantive offense.... "A common purpose and plan may be inferred from a development and a collocation of circumstances...."

*United States v. Delgado Figueroa,* 832 F.2d 691 (1st Cir.1987) (quoting *United States v. Drougas,* 748 F.2d 8, 15 (1st Cir. 1984) (internal citations omitted)). In his closing argument Defendant, through his counsel, conceded that there was overwhelming evidence of a conspiracy and of possession with intent to distribute in this case. He disputes, however, that the Government has proved that more than 500 grams of cocaine was involved.[3]

■ The Court is satisfied from the above facts that Defendant, Alexander and others agreed to procure and sell a substance containing cocaine[4] to "Jim" and that Defendant possessed cocaine with intent to distribute it. It is clear beyond a reasonable doubt that Defendant intended both to agree and to distribute. He discussed price with Alexander, said the cocaine would be available on the fifteenth, and made arrangements with his supplier [Couture] and with Alexander for the transfer.

Although the evidence shows that Defendant and Alexander possessed only smaller amounts (the eight-ball transferred on the evening of Sunday, September 13, 1987, and the .42 gram sample transferred from Defendant to "Jim" by Alexander on September 15, 1987), it is plain beyond a reasonable doubt that the agreement was to distribute one kilogram, that Defendant intended to distribute one kilogram, and that one kilogram would have been distributed had the arrest not taken place. One kilogram was the amount discussed both by Alexander and Defendant and Alexander and "Jim"; the money shown to, counted and reported by Alexander as ready for transfer to Defendant was that necessary for a kilogram buy as described by Defendant. Finally a kilogram of cocaine was found very near the point where Defendant met his source, Greg Couture, and was packaged with duct tape, as Alexander had

---

**3.** The pertinent statute, 21 U.S.C. § 841, provides for an enhanced penalty where more than 500 grams of cocaine is involved:

§ 841. Prohibited acts A

(a) Unlawful acts. Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

. . . . .

(b) Penalties. Except as otherwise provided in section 405, 405A, or 405B, any person who violates subsection (a) of this section shall be sentenced as follows:

. . . . .

(B) In the case of a violation of subsection (a) of this section involving—

. . . . .

(ii) 500 grams or more of a mixture or substance containing a detectable amount of—

. . . . .

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

. . . . .

such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18, United States Code, or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both.

**4.** A stipulation entered into by the parties provides that the substances transferred by Alexander to the confidential informant and the substance in the kilogram package found at the northerly turnaround were all substances containing cocaine.

said it was, in a manner indicating that a small quantity could have been removed as a sample through the rectangular cutout.

Defendant had repeatedly led Alexander to believe that Greg Couture was his source, and Greg Couture was present with Defendant for a lengthy period of time in the northern turnaround. Moreover, Couture's brother Mark returned for the kilogram of cocaine. The Court finds, therefore, that the kilogram found was that discussed, sampled, and intended for distribution by Defendant, Alexander and Couture to "Jim." Since Defendant's violation of 21 U.S.C. § 841(a) "involve[s]—500 grams or more of a mixture or substance containing a detectable amount of—cocaine ..." 21 U.S.C. § 841(b)(1)(B)(ii)(II), he is subject to the enhanced penalty set forth in that section.[5]

The Court, therefore, finds Defendant guilty on Count I of conspiracy to possess with intent to distribute in excess of five hundred grams of a substance containing cocaine in violation of 21 U.S.C. §§ 846, 841(a) and 841(b)(1)(B); and on Count II of possession with intent to distribute in excess of five hundred grams of a substance containing cocaine in violation of 21 U.S.C. § 841(a) and 841(b)(1)(B).

### Count III

Count III of the indictment charges Defendant with a violation of 18 U.S.C. § 924(c). That statute provides, in pertinent part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided

for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.

When he was apprehended and got out of his truck, Defendant was asked by the arresting officers if he had a gun. He replied that there was a loaded gun under the seat of the truck. The officers then retrieved a loaded Beretta semiautomatic pistol from under the driver's side of the seat. The safety on the gun was off, and it was ready to fire upon pulling of the trigger.[6] The Court of Appeals for the Third Circuit has held that the term "carries" in section 924(c) can apply to the transportation of a gun by a defendant under the seat in which he is sitting in a car. *United States v. Castro*, 776 F.2d 1118 (3d Cir. 1985) (citing *United States v. Barber*, 594 F.2d 1242 (9th Cir.1979)) (in which "carrying" pertained to a gun in a locked glove compartment). As the *Barber* court stated: "In ordinary usage, the verb 'carry' includes transportation or causing to be transported. Nothing in the legislative history indicates that Congress intended any hypertechnical or narrow reading of the word 'carries.'" *Id.* at 1244. Applying this common sense approach, it is apparent beyond a reasonable doubt that Defendant in this case "carried" the gun within the intendment of the statute. The gun was in the truck and accessible to him when he was transporting and transferring the cocaine between Couture and Alexander on an isolated Maine road. Thus, it was present during the commission of a drug trafficking offense.

Whether the Defendant carried the gun "in relation to a ... drug trafficking of-

---

5. Neither the language of the statute nor the cases arising under it make clear whether possession of the larger amount of the controlled substance is a necessary element to find liability for the enhanced penalty or whether, as the Court has inferred, intent to distribute the larger quantity triggers the enhanced liability. In any event, on this record it is plain that Defendant cannot escape the enhanced penalty for he fulfills the elements of the crime of aiding or abetting possession with intent to distribute over 500 grams of cocaine. The Court of Appeals has stated the test for aiding and abetting as follows: "In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture,

that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed'...." *United States v. Paone*, 758 F.2d 774, 775 (1st Cir.1985). Defendant here clearly sought by his action to make the distribution of the kilogram of cocaine from Couture to the confidential informant succeed.

6. Although Defendant tried to suggest that the safety had been dislodged by the officers in retrieving the gun, the Court is convinced from the testimony of the officers regarding the maneuver that that did not happen and that Defendant had transported the gun as it was found, with the safety off.

**56**

fense" is more heatedly debated by the parties. Testimony by Defendant's father, Otis Eaton, demonstrated that Defendant has a hobby of gun collection and use and that he maintains a small arsenal. Mr. Eaton testified that on several occasions he and his son had gone target practicing and that on those occasions and others, Defendant, who possesses a license to carry a concealed weapon, had transported the Beretta pistol, loaded, underneath the seat of his truck. Through this testimony, Defendant has attempted to convince the Court that carrying a loaded weapon in his truck was the norm for him and that he was not, therefore, carrying the gun in relation to the drug trafficking offense which he was committing. The Court is persuaded beyond a reasonable doubt from the other evidence, however, that on the night of his arrest Defendant was carrying the gun for purposes related to the drug deal which was to occur. On September 14, the day the transaction was supposed to take place and the day before it actually occurred, Defendant told Alexander that he would be armed at the time of the transaction because "he did not know who I was dealing with, and he did not wish to take a chance on his life or the risk of one kilo of cocaine being stolen." Even if Defendant regularly carried a gun in his truck, those statements to Alexander make it clear that Defendant intended to protect himself with the gun during the drug transaction he had arranged through Alexander. The Court finds from this expression of intent and from the fact that the gun was found with the safety off, ready to be used, that on the night he was arrested, Defendant was carrying the gun for purposes related to the drug trafficking offense in which he was engaged. The Court, therefore, finds Defendant guilty of the offense set forth in 18 U.S.C. § 924(c).

Accordingly, it is adjudged that Defendant is guilty as charged on all three counts of the indictment.

So ORDERED.